Thomas O'BRIEN, etc., et al.,
Plaintiffs, Appellants,

v.

MASSACHUSETTS BAY TRANS-
PORTATION AUTHORITY,
Defendant, Appellee.

No. 98–1502.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1998.

Decided Dec. 4, 1998.

John M. Becker, with whom Sandulli, Grace, Shapiro, Horwitz & Davidson, P.C. was on brief, for appellants.

H. Reed Witherby, with whom Smith & Duggan LLP was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

SELYA, Circuit Judge.

Wrapping their claims securely in the mantle of federalism, Thomas O'Brien and Edward O'Malley protest an order of the district court which, in effect, allows their employer, the Massachusetts Bay Transportation Authority (MBTA), to continue random drug and alcohol testing of transit police. We affirm.

## I

### Background

Most constituencies regard the Urban Mass Transportation Act, more recently dubbed the Federal Transit Act, 49 U.S.C. §§ 5301–5330, 5332–5338, 10531 (the Transit Act), as a boon; after all, it provides eligible state and local governments with generous funding for qualified public works projects. The MBTA, a political subdivision of the Commonwealth of Massachusetts, *see* Mass. Gen. Laws, ch. 161A, § 2, has long availed itself of the Transit Act's bounty. Since 1965, it has applied for and received funding to the tune of approximately $3 billion under this statutory scheme. The beat goes on: as

of June 30, 1995, the MBTA was engaged in $1 billion worth of ongoing capital projects, 80% funded by the federal government under the auspices of the Transit Act.

Federal subsidies often have strings attached, and monies disbursed pursuant to the Transit Act are no exception. One such string emanates from requirements contained in the Omnibus Transportation Employee Testing Act of 1991, Pub.L. No. 102–143, 105 Stat. 952, that Congress has made applicable to mass transit employers. *See* 49 U.S.C. § 5331 (the Testing Act). A core provision of the Testing Act requires the Secretary of Transportation to develop a program that, *inter alia*, directs recipients of the federal government's Transit Act largesse to conduct random drug and alcohol testing of "mass transportation employees responsible for safety-sensitive functions." *Id.* at § 5331(b)(1)(A). The Secretary permissibly defines "safety-sensitive functions" to include those that involve "carrying a firearm for security purposes." 49 C.F.R. §§ 653.7, 654.7. Recipients of federal aid for mass transit projects must abide by the requirements of the Testing Act and the regulations promulgated thereunder (including the requirement for random drug and alcohol tests). Failure to adhere strips a recipient of its eligibility for federal financial assistance. *See* 49 U.S.C. § 5331(g).

The MBTA is subject to the constraints of the Testing Act by reason of its continued application for, and receipt of, grants under the Transit Act. To comply with this statutory obligation, the MBTA inaugurated a program requiring MBTA police officers to submit to random drug and alcohol screens. This protocol did not gain accolades in all quarters. O'Brien and O'Malley, acting individually and in their respective official capacities as presidents of the MBTA Police Patrol Officers' Association and the MBTA Police Sergeants' Association, brought suit in the Suffolk Superior Court seeking declaratory and injunctive relief. They averred that the MBTA's policy violated their rights under both federal law and the Massachusetts Declaration of Rights (the MDR). The state court granted a preliminary injunction on the ground that Article 14 of the MDR, as interpreted in *Guiney v. Police Comm'r*, 411 Mass. 328, 582 N.E.2d 523 (1991), likely precluded enforcement of the testing protocol.[1] In arriving at its conclusion, the court rejected the notion of federal preemption, stating its disbelief that the MBTA, "by voluntarily applying for and accepting Federal funds, can then eviscerate an employee's state constitutional rights because Congress has attached a condition to those funds."

The MBTA seasonably removed the action to the federal district court. *See* 28 U.S.C. §§ 1331, 1441. Although the state court's injunction remained in effect for the time being, *see Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Etc., Local No. 70*, 415 U.S. 423, 436, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974), it did not last very long. In fairly short order, the district court granted partial summary judgment in the MBTA's favor, concluding that federal law preempted any contrary provision of state law. The court dissolved the preliminary injunction shortly thereafter. This appeal ensued. We have jurisdiction under 28 U.S.C. § 1292(a)(1) (conferring appellate jurisdiction to review interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions").

## II

### Analysis

### A.

### Preemption

■ The vast majority of preemption cases involve situations in which Congress

---

1. Article 14 of the MDR prohibits unreasonable searches and seizures. In *Guiney*, an officer claimed that a police department's random drug-testing program did not pass muster under Article 14. The Massachusetts Supreme Judicial Court (SJC) stated that, "[i]f the government is to meet the requirements of art. 14, it must show at least a concrete, substantial governmental interest that will be served by imposing random uri-nalysis on unconsenting citizens." 411 Mass. at 332, 582 N.E.2d at 526. The SJC went on to invalidate the program because the police commissioner had failed either to provide a particularized safety reason that would justify random drug tests or to articulate a "substantial public purpose" that would warrant such testing. 411 Mass. at 332, 582 N.E.2d at 525.

has exercised its power under the Commerce Clause. *See* Laurence H. Tribe, American Constitutional Law § 6–29, 508 (2d ed.1988). Here, however, we are dealing with a congressional exercise of the spending power, not the commerce power, and the dynamics between preemption and Congress's reliance on the spending power differ appreciably from those applicable in the Commerce Clause context. The principal difference is that whereas preemptive legislation enacted under the Commerce Clause trumps state law throughout the United States *ex proprio vigore,* preemptive legislation enacted under the spending power presents states with a choice: they may either accept federal funds (and subject themselves to requirements imposed by federal law) or decline such funds (and avoid the necessity of abiding by those requirements). *See Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 112, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *see also Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) *(Pennhurst I )* (stating that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions").

 Thus, if this were a situation in which the federal sovereign had invoked the spending power to justify preemption over the laws of a state that had eschewed federal funds, we could not dismiss lightly the state court's intuition about the awkwardness of asserting preemption solely on the basis of Congress's exercise of that power. In this case, however, the MBTA did not refuse to accept federal mass transit money, but, rather, willingly tapped into the federal fisc (and, as far as we can tell, intends to continue accepting federal funds for the indefinite future). When Congress delineates conditions governing the receipt of federal dollars and a state agency accepts the money on that basis, the Supremacy Clause requires conflicting

local law to yield.. *See CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663–64, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *Lawrence County v. Lead–Deadwood Sch. Dist. No. 40–1,* 469 U.S. 256, 269–70, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985); *Blum v. Bacon,* 457 U.S. 132, 145–46, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982); *Carleson v. Remillard,* 406 U.S. 598, 601, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972); *Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Helvering v. Davis,* 301 U.S. 619, 645, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *Local Div. 589, Amalgamated Transit Union v. Commonwealth of Mass.,* 666 F.2d 618, 627 (1st Cir.1981) (Breyer, J.).[2] The rule, then, is crystal clear: as long as a state receives federal funds for a particular purpose, its law, if contrary to conditions attached to the funds, must give way to federal law.

That brings the finish line into sight. It cannot be gainsaid that the most obvious cases for federal preemption occur when Congress has expressly declared its intent. *See, e.g., Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); *Greenwood Trust Co. v. Commonwealth of Mass.,* 971 F.2d 818, 822 (1st Cir.1992). The Testing Act supplies a classic example of this species of legislative expression. It unambiguously provides that "[a] State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order. that is inconsistent with regulations prescribed under this section." 49 U.S.C. § 5331(f)(1). That message is reinforced by the regulations. *See* 49 C.F.R. §§ 653.9, 654.9. The plain language of these provisions bespeaks "conflict preemption," *see, e.g., Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), which means that the only remaining question here is whether state law either contradicts applicable federal law or frustrates the objects that federal law seeks to promote, *see, e.g., Boggs v. Boggs,*

---

**2.** To be sure, individual Justices have from time to time suggested that the authority for adhering to federal law when Congress employs its spending power is not to be located in the Supremacy Clause. *See, e.g., Townsend,* 404 U.S. at 292, 92 S.Ct. 502 (Burger, C.J., concurring). But these moments have been few and far between and, more important, they have not debilitated the general conclusion that the laws of a jurisdiction that receives federal funds must, when a relevant conflict looms, give way to federal law.

520 U.S. 833, 117 S.Ct. 1754, 1760–61, 138 L.Ed.2d 45 (1997).

This question is easily answered. There can be no doubt that the MDR, as interpreted by the state superior court and by the plaintiffs, conflicts with the requirements imposed by federal law. Quite simply, the state court's preliminary injunction (premised on its reading of state law) prevented the MBTA from conducting the random drug and alcohol testing that federal law (namely, the Testing Act) requires recipients of federal Transit Act funds to sponsor. Moreover, contrary to the state court's intimation, it is of no moment that in this instance a federal law supplants a state constitutional—as opposed to a statutory or regulatory—provision. Such a result is exactly what the letter of the Supremacy Clause demands. *See* U.S. Const., Art. VI, cl. 2 (mandating that federal law "shall be the supreme Law of the Land ..., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"). Thus, we unhesitatingly affirm the district court's conclusion that federal law has preemptive force in this situation.[3]

### B.

### Conforming Conduct to State Law

■ In this venue, the plaintiffs shift their emphasis. They maintain that, even if section 5331(f)(1) binds the MBTA to follow the Testing Act's directive as long as it continues to receive federal financial assistance, the injunction nonetheless should remain in force. To support this proposition, they embellish their original claim. Instead of arguing simply that federal law lacks preemptive effect and that the MDR forbids the MBTA from conducting random tests, the plaintiffs assert that the MBTA should be precluded from applying for federal funds in the first place, because accepting such funds will create an inevitable conflict with state law. The paramount problem with this argument—there are others which we need not discuss—is that it invites a federal court to enjoin state officials (those who manage the MBTA) from acting in a manner that allegedly contravenes state law.

■ It is not the proper purview of a federal court to supervise state officials' compliance with state law. *See ANR Pipeline Co. v. Lafaver,* 150 F.3d 1178, 1188–89 (10th Cir.1998); *LaShawn A. by Moore v. Barry,* 144 F.3d 847, 852 (D.C.Cir.1998); *Archie v. City of Racine,* 847 F.2d 1211, 1216 (7th Cir.1988) (en banc). As Justice Powell observed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*Pennhurst II*). Hence, we decline the plaintiffs' invitation to cross this line.

Relatedly, we note the anomaly inherent in the plaintiffs' position. Although we take no view on the requirements of Massachusetts law, it is difficult to fathom, as an abstract matter, how forcing a state agency to forgo billions of dollars in federal subsidies would render its hierarchs more accountable to the citizenry—or how such a step would profit the agency's workforce in the long run. Were Massachusetts to renounce federal funds in order to save the plaintiffs from the indignity of random drug and alcohol tests, the Commonwealth then would have only four options (to be used singly or in combination): it could raise taxes to fill the budgetary gap, transfer funds from some other line in the budget, lay off MBTA employees to curtail expenses, or cease all construction and improvements relating to mass transit. None of these alternatives strikes us as attractive from the standpoint of the workers whom O'Brien and O'Malley represent. More important, though, if such dire remedies are to be implemented, that is a decision for Massachusetts to make, not one for a federal court to impose. *Cf. Missouri v. Jenkins,* 495 U.S. 33, 50–51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (holding that a federal court's order for a local tax increase violated principles of comity).

---

**3.** As a fallback argument, the MBTA maintains that Congress passed the Testing Act pursuant to its power under the Commerce Clause. In light of our conclusion about the preemptive effect of federal law promulgated under the spending power, we need not address this argument.

## C.

### The Scope of the Protocol

The plaintiffs have a final shot in their sling. They asseverate that the district court should not have dissolved the injunction completely because the MBTA's testing policies exceed the requirements set forth in the federal regulations (and to that extent are not within the prophylaxis of section 5331(f)(1)). They claim, for example, that the MBTA's alcohol screening standard is twice as strict as that mandated by federal law and that the MBTA tests for more substances than federal law specifies. The MBTA disputes the accuracy of these charges and states that its protocol faithfully tracks federal requirements.

We need not resolve this contretemps. To the extent that the plaintiffs claim that exceeding federal testing requirements, without more, violates federal law, they are mistaken. It is not enough to aver that the MBTA's protocol differs from the federal prototype. From the viewpoint of federal preemption, differences are not significant unless they conflict with federal law in a manner that somehow frustrates the purposes behind that law. *See Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.*, 467 U.S. 622, 627, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984) (holding that the Supremacy Clause "invalidates any state law that contradicts or interferes with an Act of Congress"). Here, the plaintiffs fail to demonstrate any material dissonance between the Testing Act and the MBTA's protocol. Indeed, regulations promulgated under the Testing Act contemplate the possibility that a state may enact tougher requirements—and they do not preclude a state from doing so. *See* 49 C.F.R. § 653.25(i) (recognizing the possibility that an employer may implement an anti-drug program that tests for more than the five controlled substances specified by the Testing Act regulations); *see also id.* at § 653.11 (preventing employers from adopting additional measures only if such measures would frustrate the purposes of the Testing Act, as elucidated in the applicable regulations).[4]

Nor can the plaintiffs rewardingly recast their thesis. To the extent that they are claiming that a federal court should grant injunctive relief (or leave such relief intact) because certain provisions in the MBTA's protocol, not compelled by federal law, violate state law, this argument is merely a reprise of the argument that we previously rejected. *See* Part II(B), *supra.* In short, the plaintiffs again ask us to conform the MBTA's testing protocol to what they contend are the requirements of state law. *Pennhurst II* forbids us from honoring this request.

## III

### Conclusion

We need go no further. Massachusetts authorities have elected to draw on federal coffers to finance a bevy of mass transit projects. Having accepted those funds, they must abide by the conditions that Congress attached to them, one of which mandates random drug and alcohol screens for employees who, like the plaintiffs, perform safety-sensitive functions. Because applicable federal law includes an express preemption provision, contrary state law cannot stand as an obstacle to the testing protocol. Moreover, to the extent that the plaintiffs claim that the MBTA's initial decision to seek federal funding transgressed state law, they are attempting to press their claim in a forum in which it is not properly cognizable.

***The order dissolving the preliminary injunction is affirmed. Costs to appellee.***

---

4. When the Secretary of Transportation first promulgated this portion of the regulations, he explained that "[a]n employer may impose other requirements in addition to those imposed by this rule if those additional requirements do not conflict or interfere with the requirements of this rule." Prevention of Drug Abuse in Transit Operations, 59 Fed.Reg. 7572, 7584 (1994).