Paul **BYRNE** and Paul Macmillan, Individually, and in their official capacity as Presidents of the MBTA Police Patrol Officers' Association and the MBTA Police Sergeants' Association, respectively, Plaintiffs

v.

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,** Defendant

No. CIV.A. 95–10837–GAO.

United States District Court, D. Massachusetts.

April 18, 2002.

John M. Becker, Sandulli, Grace, Shapiro, Horwitz & Davidson, Boston, MA, for Plaintiffs.

H. Reed Witherby, Smith & Duggan, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

O'TOOLE, District Judge.

In 1991 Congress directed the Secretary of Transportation to prescribe regulations that would require recipients of federal mass transportation grants to conduct drug and alcohol testing of employees responsible for the performance of safety-sensitive functions. 49 U.S.C. § 5331(b) (Omnibus Transportation Employee Testing Act of 1991 ("OTETA"), Pub.L. No. 102–143, § 6, 105 Stat. 952). The Secretary, acting through the Federal Transit Authority ("FTA"), duly promulgated regulations to carry out that mandate. *See* 49 C.F.R. pts. 40, 655.

The defendant, the Massachusetts Bay Transportation Authority ("MBTA"), is a recipient of federal mass transportation grants subject to the regulations and has adopted a drug and alcohol testing policy (the "Policy") in compliance with the regulations.[1] The plaintiffs are employed by

---

1. During the pendency of this litigation, the MBTA's Policy has been revised several times. The current version of the Policy became effective on August 1, 2001.

the MBTA as police officers and serve as the presidents, respectively, of the MBTA Police Patrol Officers' Association and the MBTA Police Sergeants' Association. They have brought this lawsuit seeking a declaration that the Policy contravenes both federal and state law in various respects and an injunction against the enforcement of the Policy to the extent it is unlawful.

The plaintiffs originally filed suit against the MBTA in state court. The Massachusetts Superior Court granted the plaintiffs a preliminary injunction which enjoined the MBTA from implementing the Policy. The MBTA then removed the case to this Court.

This Court previously concluded that the claim that the Policy violated provisions of the Declaration of Rights of the Massachusetts Constitution (set forth in Count I of the complaint) was pre-empted by the federal regulations. Summary judgment was accordingly granted in favor of the MBTA as to that count, and the state court's injunction was dissolved. The dissolution of the injunction was affirmed after appeal. *O'Brien v. Massachusetts Bay Transp. Auth.*, 162 F.3d 40 (1st Cir.1998).

Now both sides have cross-moved for summary judgment in their favor as to the remaining counts of the Amended Complaint. There are four counts to be considered. In Count II, the plaintiffs allege that the Policy violates the Massachusetts Privacy Act, Mass. Gen. Laws ch. 214, § 1B (" § 1B"). In Count III, the plaintiffs challenge the Policy under 42 U.S.C. § 1983 as a violation of the Fourth Amendment to the United States Constitution. In Count IV, the plaintiffs contend that the Policy fails to comport with the federal testing regulations. Finally, in Count V, the plaintiffs claim that by unilaterally adopting the Policy, the MBTA violated what they characterize as its obligation to engage in collective bargaining imposed by Mass. Gen. Laws ch. 161A, § 25.

For the following reasons, the MBTA's motion is granted.

### 1. The Policy's Urine Collection Procedures Do Not Violate the Fourth Amendment

Under the Policy, all MBTA employees, including the plaintiffs, who hold safety-sensitive positions are subject to random, suspicionless drug and alcohol testing. *See* Devaney Fourth Decl. Ex. A at 11. The testing, administered by the MBTA's Medical Operations staff, requires the employee to produce a urine sample. *Id.* at 15. Normally, the employee is accorded personal privacy in producing the sample, but in certain limited circumstances to guard against possible tampering with the sample, the Medical Operations staff person in charge of collecting the sample may observe the employee directly during urination. *Id.* at 18–19.

The Policy provides: "Procedures for collecting urine specimens shall allow individual privacy unless there is reason to believe that a particular individual may alter or substitute the specimen to be provided." *Id.* at 18. The Policy outlines four specified circumstances in which direct observation of collection may be appropriate when the collector has reason to believe that the employee tampered with a prior, unobserved collection: (1) there is no adequate medical explanation for the invalidity of the prior sample; (2) the prior sample was adulterated or substituted; (3) the temperature of the prior sample suggests adulteration; or (4) there are other indications that the prior sample had been tampered with. *Id.* at 19. Directly observed collections are also required if the collector detects either that the employee has brought materials to the collection site with the intent to alter the specimen or

that the employee engages in conduct that clearly indicates an attempt to tamper with the initial specimen. *Id.* Finally, the collector may observe the collection of a urine sample from an employee who had previously tested positive for prohibited drugs or for alcohol and who is either returning to work or providing a follow-up test within the first twelve to sixty months after returning to work. *Id.* at 14, 19. With respect to the last category, referred to as "return-to-work" and "follow-up" tests, observed collections are permitted only when the collector has "reason to believe that a particular individual may alter or substitute the specimen to be provided." *Id.* at 18.

When conducting an observed collection, the collector must first obtain permission to observe the employee from a higher-level supervisor. *Id.* at 19. All observed collections must be performed by a collector who is of the same gender as the employee being observed. *Id.* When a return-to-work or follow-up test is conducted, the collector must state the reasons for observation in writing. *Id.*

 Collection and analysis of urine samples by a governmental agency are restricted by the Fourth Amendment's guaranty that persons not be subjected to "unreasonable" searches. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Whether a particular search is "reasonable" is to be judged "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402 (citation and internal quotation marks omitted).

The Supreme Court has determined that the Fourth Amendment permits random drug testing of government employees engaged in safety-sensitive functions. *Skinner,* 489 U.S. at 620, 109 S.Ct. 1402. The plaintiffs, all of whom are MBTA police officers, clearly are engaged in safety-sensitive work, *see Guiney v. Roache,* 873 F.2d 1557 (1st Cir.1989) (law enforcement officers who carry guns and engage in drug interdiction are engaged in safety-sensitive work), and they do not contend otherwise. Nor do they dispute the general proposition that the MBTA may subject them, as employees performing safety-sensitive functions, to random, suspicionless drug testing. The plaintiffs' principal argument is that though the nature of their work permits the MBTA to subject them to random drug tests, the MBTA's policy of permitting direct observation of employees during urine collection is unreasonable under the Fourth Amendment.

There can be no doubt that direct observation of an employee's production of urine samples for testing involves a significant intrusion upon the employee's personal privacy. The Supreme Court has held that limited, indirect observation may be conducted to help assure the genuineness of the sample submitted for analysis, even where the collector had no suspicion of tampering. In *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 650, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Supreme Court upheld against Fourth Amendment challenge a school district's implementation of a random drug testing program for student athletes that involved the presence of monitors who stood behind male athletes during urination at a distance of twelve to fifteen feet. In determining that the school district's policy did not violate the Fourth Amendment's reasonableness requirement, the Supreme Court considered the privacy interest on which the search intruded, the degree of the intrusion, and whether the governmental interest was "important enough to justify the

particular search at hand." *Id.* at 654, 658, 661, 115 S.Ct. 2386. Subsequently, applying the same three-part analysis, the Third Circuit upheld a suspicionless drug testing scheme for firefighters which required a monitor to look "in the firefighters' general direction to ensure that no tampering was taking place during the production of the urine specimen." *Wilcher v. City of Wilmington,* 139 F.3d 366, 375 (3d Cir.1998).

The direct observation required both by the FTA's regulations and by the Policy is more intrusive than the observation required in *Vernonia* or *Wilcher.* The regulations leave no doubt about how direct the direct observation is meant to be, instructing collectors: "As the observer, you must watch the employee urinate into the collection container. Specifically, you are to watch the urine go from the employee's body into the collection container." 49 C.F.R. § 40.67(i).

The opinions in *Vernonia* and in *Wilcher* both take pains to point out that the observation involved in the collection processes in those cases was less than direct. In *Vernonia,* for example, the Court noted that the conditions of collection were "nearly identical to those typically encountered in public restrooms." 515 U.S. at 658, 115 S.Ct. 2386. The *Wilcher* court noted that its resolution of the question presented might be different if more direct observation was a feature of the collection process: "We note that our conclusion might differ had the district court accepted the firefighters' testimony that ... monitors looked over the firefighters' shoulders as they provided their urine specimens. Similarly, we would be much more concerned with a procedure's intrusion on privacy if it required the monitor to stand in front of the firefighter, or if it demanded the direct observation of the firefighter's genitalia." 139 F.3d at 376 n. 6.

Because a collector's direct observation of the production of the urine sample, as described in the FTA's regulation, represents a greater intrusion upon an employee's privacy than occurs in cases of unobserved or indirectly observed collection, it may be justified only if it serves a real and compelling governmental interest. The MBTA has made a convincing case that direct observation is justified in the limited circumstances, and under the conditions, authorized by the Policy.

If the governmental employer may conduct random drug and alcohol testing of safety-sensitive employees, surely it may take reasonable steps to assure that the testing is accurate and effective. In most cases, generalized anti-tampering measures may be effective, such as protocols that permit private collection of the sample in an environment where the opportunity for tampering would ordinarily be low. A private room dedicated to the purpose that can frequently be inspected would be an example.

But occasionally there may be factors present that would suggest that a greater degree of vigilance is required. The Policy addresses three kinds of factors. If the employee had given a previous sample that appeared to have been tampered with, the Policy permits a second sample to be collected under observation. If the employee has either the opportunity to tamper with a sample, by the possession of materials that could be used to tamper, or the motive to do so, evidenced by conduct that indicates an intention to tamper, then the collector may require the collection be observed. And lastly, an employee who is returning to work or providing a follow-up test after having previously failed a drug test may be observed if the collector has a basis for believing that the person would attempt to alter or substitute the sample if it were collected without observation.

These predicates for observed testing are not sweeping, but rather are narrowly focused on preventing tampering with

samples. They do not aim to do any more than assure valid tests when there is a reason for heightened concern about validity. The narrowness of the focus is demonstrated by the statistics of actual employment of the direct observation authority. Of the several thousand samples collected from MBTA employees for testing each year, only about five or six are collected pursuant to the direct observation procedures, and no specimens from MBTA police officers have ever been collected under observation. *See Devaney Fifth Decl.* ¶ 4.

Overall, the MBTA's Policy permits direct observation only in circumstances where there is reason to be suspicious about the integrity of a sample that would be produced in an unobserved collection. The Policy also establishes safeguards to ensure that observation is not carried out arbitrarily or inconsistently. Before there may be direct observation, the collector must have a factual basis for such a suspicion and must obtain a supervisor's approval. For follow-up and return-to-work tests, the collector must set forth his reasons for observation in writing. While any MBTA police officer may be randomly selected without suspicion of drug or alcohol use to give a urine sample for analysis, no officer may be required to submit to direct observation unless a reason for that additional precaution exists and is articulated. The greater level of intrusion is balanced by the greater concern for the integrity of the testing process. The Policy does not violate the Fourth Amendment's guaranty.

### 2. The Policy's Minor Differences form Mandated Federal Procedures Do Not Violate the Massachusetts Privacy Act

■ The plaintiffs also argue that the Policy deviates in some respects from the collection procedures detailed in the federal regulations and that because of those deviations the Policy constitutes an unreasonable invasion of privacy actionable under the Massachusetts Privacy Act, Mass. Gen. Laws ch. 214, § 1B.[2] In particular,

---

**2.** All of the claims brought by the plaintiffs under state law raise a potential issue under the Eleventh Amendment. Generally, the Eleventh Amendment bars a federal court from adjudicating a claim that a state actor has violated state law. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"). Under this rule, the First Circuit declined to review whether the Policy conformed with the Massachusetts Declaration of Rights when it affirmed this Court's earlier dissolution of the state court's injunction. *O'Brien,* 162 F.3d at 44. Despite the First Circuit's recognition of the Eleventh Amendment bar, the parties have continued to argue the merits of the MBTA's state law claims. The MBTA has never asserted its "Eleventh Amendment immunity" in this Court. *See Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (recognizing that while the phrase "Eleventh Amendment immunity" serves as a "conve-

nient shorthand," it is a "misnomer"). Some cases have suggested that when a state actor removes a case which contains federal and state law claims to federal court and then proceeds to litigate the merits of the state law claims, the state actor has waived its Eleventh Amendment arguments. *See McLaughlin v. Board of Trustees of State Colleges of Colorado,* 215 F.3d 1168, 1171 (10th Cir.2000) (removing a case to federal court and litigating the merits of the state law claim is an effective waiver of Eleventh Amendment immunity); *Watkins v. California Dep't of Corrections,* 100 F.Supp.2d 1227, 1230 (C.D.Cal.2000) (collecting recent cases and holding that "in determining whether a state has voluntarily invoked the jurisdiction of a federal court, the most important factor to consider is whether the state has actively litigated the merits of its case before the federal tribunal") (internal quotations omitted). *See also, Wisconsin Dep't of Corrections v. Schacht,* 524 U.S. 381, 393–98, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (Kennedy, J., concurring) (suggesting that when a state removes a case to federal court, the removal could constitute waiver of

the plaintiffs allege that the Policy fails to protect the employees in five ways that the federal regulations require. First, they say that the Policy does not require that the employee be given an explanation of the reasons why observation is necessary in his specific case. *See* 49 C.F.R. § 40.67(d). Second, the collector is not required to provide proof of identification upon the employee's request. *See id.* § 40.61(d). Third, the Policy does not expressly permit an employee to retain his wallet. *See id.* § 40.61(f). Fourth, the Policy does not require the collector to instruct the employee that he should not list medications he is taking on the test form. *See id.* § 40.61(g). Finally, the plaintiffs allege that the Policy impermissibly gives the collector some discretion to determine whether observation is required when an employee returns to duty after taking unauthorized medication or is subjected to a follow-up exam after a return to duty. *See id.* § 40.67(b).

■ To begin with, as has already been established with respect to Count I, a claim that the Policy violates state law is preempted to the extent that the Policy gives effect to the federal mandate that recipients of federal mass transportation grants establish procedures for random drug and alcohol testing of safety-sensitive employees. *See O'Brien,* 162 F.3d at 43–44. For the most part, the Policy represents the effectuation of the federal mandate. Though there are a few differences, the Court of Appeals noted that the plaintiffs had not shown "any material dissonance between the Testing Act and MBTA's protocol." *Id.* at 45. "It is not enough to aver that the MBTA's protocol differs from the federal prototype. From the viewpoint of federal preemption, differences are not significant unless they conflict with federal law in a manner that somehow frustrates the purposes behind that law." *Id.*

What the plaintiffs seem to allege is that the five differences outlined above are not essential to the federal purpose and, therefore, that a state law claim addressed to those differences is not preempted. Assuming *arguendo* that to be the case, the claim that the *differences themselves* (since that is all that is available for a state law claim) violate § 1B is without merit.

■ The Massachusetts statute provides: "A person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. When evaluating whether an employer's actions violate § 1B, "the employer's legitimate interest in determining the employees' effectiveness in their jobs should be balanced against the seriousness of the intrusion on the employees' privacy." *Bratt v. International Bus. Machs. Corp.,* 392 Mass. 508, 467 N.E.2d 126, 135 (1984).

The Massachusetts Supreme Judicial Court has not ruled out observation as a feature of random urine collection and testing procedures for employees whose

immunity); *Newfield House, Inc. v. Massachusetts Dep't of Pub. Welfare,* 651 F.2d 32, 36 n. 3 (1st Cir.1981) (a pre-*Pennhurst* decision stating that, "We need not decide whether a federal court could restrain state officials solely under a pendent state law claim, for we conclude that the state has waived its rights under that amendment by having the case removed to federal court."). Since the parties have not briefed these issues, and a federal court is not obligated to raise them *sua*

*sponte,* the more appropriate course is to dispose of the plaintiffs' state law claims on the merits. *See Patsy v. Board of Regents of Florida,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ("because of the importance of state law in analyzing Eleventh Amendment questions and because the State may, under certain circumstances, waive this defense, we have never held that it is jurisdictional in the sense that it must be raised and decided by this Court on its own motion").

jobs are dangerous or require heightened alertness or care. *See Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 630 N.E.2d 586, 588–89 (1994) (permitting visual inspection of the employee's body prior to a suspicionless drug test); *O'Connor v. Police Comm'r of Boston*, 408 Mass. 324, 557 N.E.2d 1146, 1151 (1990) (permitting suspicionless, observed urine collection because the Police Commissioner's "compelling interest in determining whether cadets were using drugs and in deterring such use" outweighed the cadets' privacy interests).[3] The only time the Supreme Judicial Court has held that a drug testing procedure violated § 1B was in a case where the employee being tested was not engaged in a dangerous or safety-sensitive occupation. *See Webster v. Motorola, Inc.*, 418 Mass. 425, 637 N.E.2d 203, 208 (1994) (noting that any nexus between the plaintiff's job responsibilities and risk of harm to human health and safety were "attenuated").

As these cases indicate, the balancing test to be used in evaluating the propriety of a drug testing policy under § 1B is very similar to the balancing approach applied in the Fourth Amendment analysis. Since the Policy does not violate the Fourth Amendment, it is not likely that the Policy as a whole would be found to be an "unreasonable, substantial or serious interference" with the privacy of the plaintiffs in violation of § 1B. It is even easier to say that the relatively minor ways in which the MBTA has voluntarily extended the Policy's specifics beyond what is literally mandated by the federal regulations do not amount to such an interference.

To the extent the privacy claim is not preempted, it is not meritorious.

3. *The Policy's Medication Disclosure Requirement Does Not Violate the Massachusetts Privacy Act*

■ The Policy requires that all "safety-sensitive employees consult with Medical Operations before using prescription or over-the-counter medications that contain alcohol or other substances that may impair their ability to perform safety-sensitive duties." *Devaney Fourth Decl.* Ex. A at 4. This provision is not mandated by the federal regulations. The plaintiffs assert that this requirement to disclose medications to medical officers violates their rights to privacy under § 1B.

Evaluated in accordance with the balancing test used by the Massachusetts courts with respect to claims brought under § 1B, the Policy's medication disclosure requirement does not violate the statute. In the first place, the intrusion into the plaintiffs' privacy is not very great. The information the Policy requires the plaintiffs to disclose is the same which would commonly occur during a routine face-to-face examination by a medical officer. Moreover, the information is not disseminated. Under the Policy, employees only disclose the medications they are taking to a Medical Operations doctor or nurse. Devaney Fourth Decl. Ex. A at 4. The doctor or nurse then determines "whether the employee's use of the medication could impair the employee's performance or jeopardizes the safety of the employee, his/her co-workers or the public." *Id.* The Medical Operations staff con-

---

**3.** The cadets in *O'Connor* brought suit under both Section 1B and Article 14 of the Massachusetts Declaration of Rights. 557 N.E.2d 1146. Subsequently, in *Guiney v. Police Comm'r of Boston*, 411 Mass. 328, 582 N.E.2d 523 (1991), the Supreme Judicial Court struck down a random drug testing program for police officers under Article 14 of the Massachusetts Declaration of Rights. The holding in *Guiney* holding, however, did not alter the *O'Connor* holding regarding the protection afforded by § 1B of the Massachusetts Privacy Act.

tacts the employee's supervisor only if the employee is disqualified by reason of his taking the medication from some or all of his duties. *Id.* The supervisor is not told any information other than the employee's job restrictions "unless the employee requests in writing" that the supervisor receive additional information. *Id.*

On the other side of the scale, the MBTA has a substantial interest in ensuring that its police officers' faculties are unimpaired not only by prohibited drugs or alcohol but also by any medications they are legitimately taking. The potential for harm to either MBTA employees or to the general public is just as great when an officer is impaired by legal medications as when he is impaired by illegal drug use. On balance, the MBTA's interest in safety justifies the relatively limited intrusion on the plaintiffs' privacy created by the required disclosure of medications.

The First Amended Complaint alleges that the disclosure of medications is also a violation of the Fourth Amendment and of the Massachusetts Civil Rights Act, Mass. Gen. Laws, ch. 12, §§ 11H and 11I. Neither party has addressed these claims in its summary judgment briefs. However, the balancing of interests analysis also applies to the Fourth Amendment, *see Vernonia,* 515 U.S. at 660–61, 115 S.Ct. 2386, and under that balancing, the Policy is not condemnable.

4. *The Plaintiffs Have No Private Right of Action under OTETA*

▉ The plaintiffs challenge several aspects of the Policy because they believe these portions of the Policy conflict with or improperly exceed the FTA regulations promulgated under OTETA. In effect, the plaintiffs seek to "enforce" the federal regulations by invoking them to limit the ability of the MBTA to adopt different or additional testing policies.

In order to challenge the Policy under a federal statute or regulations, the plaintiffs must show that the Congress intended to create a private right of action for that purpose. The parties agree that there is no express provision in OTETA or its implementing regulations for such a right, but the plaintiffs urge that such a right can be implied.

▉ In support of their position, the plaintiffs rely on *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which held that the following four factors determine when a private right of action ought to be understood as implied:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted. . . . Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. 2080 (citations and internal quotations omitted). However, the Supreme Court has more recently stressed that the inquiry must primarily focus on congressional intent. In *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) the Court stated:

It is true that in *Cort v. Ash,* the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by

implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent. *Id.* at 575–76, 99 S.Ct. 2479 (citation omitted). In cases where neither the text of the statute nor the legislative history make any indication that the law was intended to create a private right of action, the court should not imply one. *Id.* at 576, 99 S.Ct. 2479. *See also Maldonado v. Dominguez*, 137 F.3d 1, 7 (1st Cir.1998) (holding that there is a "strong presumption" against finding an implied right of action in a statute).

The plaintiffs have not pointed to any legislative history which would tend to support such a right. *See Stowell v. Ives*, 976 F.2d 65, 70 n. 5 (1st Cir.1992) (holding that the presumption against a private right of action will endure "unless the plaintiff proffers adequate evidence of a contrary congressional intent"). In the absence of legislative history indicating that Congress intended to create a private right of action, both the Sixth and the Second Circuits have refused to imply such a right under OTETA. *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 308–09 (6th Cir.2000) (no private right of action under Department of Transportation drug testing regulations promulgated under OTETA); *Drake v. Delta Air Lines, Inc.* 147 F.3d 169, 170–71 (2d Cir.1998) (no private right of action under the Federal Aviation Administration drug testing regulations promulgated under OTETA). The Second Circuit also pointed out that in 49 U.S.C. § 46101, OTETA provides an administrative mechanism for bringing grievances and claims arising under the Act. *Drake*, 147 F.3d at 171 n. 2. This provision for an administrative remedy weighs against an inference that Congress intended also to create an independent cause of action.

The plaintiffs have not successfully shown that a private right of action to enforce OTETA should be implied. As a result, the plaintiffs may not bring the claim they purport to set forth in Count IV, and this Court does not need to pass on the merits of such claim.

### 5. *The MBTA Did Not Violate Its Collective Bargaining Obligations*

 The plaintiffs' final attack on the Policy is their claim that the MBTA violated its collective bargaining obligations under state law by adopting the Policy unilaterally. Of course, to the extent the MBTA was obliged to adopt the Policy by federal mandate, the claim that the adoption violated a state statute is preempted.

 The plaintiffs argue, however, that the MBTA still had an obligation under state law to bargain about matters that were peripheral to the Policy or that concerned collateral consequences of its adoption. The MBTA acknowledges that there might be such issues that could be proper subjects for collective bargaining, but further says that the plaintiffs have never presented any specific demand to bargain with respect to any such issues. On the present motions, the plaintiffs have not shown that consequences of the Policy or matters peripheral to its implementation were sought to be made the subject of collective bargaining. In the absence of a specific demand, it is not possible to assess whether any particular issue might fall within the limited scope of proper subjects for bargaining or whether that issue would be foreclosed because it would fall within the scope of the federal drug testing mandate. To the extent the plaintiffs seek to complain that they were entitled to bargaining as to an issue, it rests with them to show both that the issue falls outside the scope of the federal mandate and that the MBTA had improperly rebuffed a demand

to bargain with respect to that issue. On the present record, the plaintiffs have done neither.

### 6. *Conclusion*

For all the foregoing reasons, the MBTA's cross-motion for summary judgment on all the remaining counts in the First Amended Complaint is GRANTED. Since summary judgment on Count I was previously granted in favor of the MBTA, judgment shall enter in favor of the MBTA on each of the counts of the complaint.

It is SO ORDERED.