CITIZENS FOR HONESTY AND INTEGRITY IN REGIONAL PLANNING and Karl J. Turecek, Plaintiffs,

v.

COUNTY OF SAN DIEGO and Does 1 Through 50, et al., Defendants.

Civ. No. 02 CV 1855 B(RBB).

United States District Court, S.D. California.

April 15, 2003.

B. Demar Hooper, Law Office of B. Demar Hooper, Sacramento, CA, for Plaintiffs.

C. Ellen Pilsecker, Office of County of San Diego, County Counsel, San Diego, CA, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BREWSTER, Senior District Judge.

### I. FACTUAL BACKGROUND

Title XII of the Food Security Act of 1985 (16 U.S.C. § 3801 *et seq.*) ("FSA"), governing wetland conservation, is commonly known as "Swampbuster." Any person who produces an agricultural commodity on converted wetland forfeits eligibility for a variety of federal loans and farm subsidies. *See* 16 U.S.C. § 3821(a). Thus, Swampbuster acts as an incentive for the conservation of wetlands.

The Swampbuster provisions define "wetland" as any property consisting of: (1) hydric soils, (2) wetland hydrology, *and* (3) hydrophytic vegetation. *See* 16 U.S.C. § 3801(a)(18). In contrast, the County of San Diego's Resource Protection Ordinance ("RPO") defines "wetland" as any property containing: (1) hydric soils, (2) wetland hydrology, *or* (3) hydrophytic vegetation. *See* RPO Art. II, ¶ 16. Clearly, the RPO definition of "wetland" is far broader than the definition found in Swampbuster. Therein lies the dispute between the parties to this litigation.

Plaintiff Karl A. Turecek is the managing general partner of Jacumba Valley Ranch Ltd. Partnership ("Jacumba"), an entity that owns and farms land located in San Diego County ("the County"). Turecek filed with the County a specific plan and an application for a major use permit to develop his property.

In September 1994, Turecek received a letter from the County Department of Planning and Land Use ("DPLU") informing him of the County's intention to apply the RPO definition of "wetland" to his property.[1] *See* Decl. of C. Ellen Pilsecker in Supp. of County's Mot. for Summ. J. ("Pilsecker Decl.") at Ex. B, p. 2. (letter dated September 6, 1994). Turecek urged the County to utilize the federal definition, and in March 1995, he received a letter from the DPLU stating that if "the land under tillage is not wetland, under federal definitions, then the [DPLU] will recommend that the appropriate hearing bodies also accept that conclusion." *See* Pilsecker Decl. at Ex. D, p. 10. (letter dated March 28, 1995). Whatever became of the DPLU's promised recommendation is unknown to the Court, but the County made no attempt to enforce the RPO against Turecek while his aforementioned application was pending for more than eight years. For reasons apparently unrelated to the RPO, the application was finally denied on January 15, 2003.

Turecek and Citizens for Honesty and Integrity in Regional Planning ("CHIRP")[2] filed this action on September 17, 2002, seeking a declaratory judgment (28 U.S.C. § 2201) that the RPO definition of "wetland" is preempted by the FSA's Swampbuster provisions. On October 28, 2002, the County filed a motion to dismiss pursuant to subsections (b)(1) and (b)(6) of FRCP 12. The County maintained that a dismissal was warranted because: (1) the plaintiffs lacked standing; (2) the matter was not ripe for adjudication; and (3) the

---

1. The RPO does not apply to ongoing, preexisting agricultural operations. *See* RPO Art. 5, ¶ 10. However, if wetlands are located on property that is the subject of a request for a discretionary permit, then the RPO empowers the DPLU to impose significant restrictions on land use as a condition of approval. *See* RPO Art. III, ¶ 3.

2. CHIRP is a "grassroots community group that ... was organized for the purpose of representing the interests of the public." Pl.'s Cmpl. at ¶ 1.

Swampbuster provisions do not preempt the RPO.

In an Order filed December 20, 2002, the Court found that Plaintiff CHIRP lacked standing to adjudicate and dismissed CHIRP's claims for lack of subject matter jurisdiction. *See* Order Granting in Part and Denying in Part Defendant County of San Diego's Motion to Dismiss Plaintiffs' Complaint Pursuant to FRCP 12(B)(1) ("Order of December 20, 2002") at 6. The Court held that Turecek had standing and the matter was ripe for adjudication, but that the ultimate question of preemption ought to be handled in the context of a summary judgment motion rather than a motion to dismiss. *See id.* at 5–6. Accordingly, the Court invited the parties to file cross-motions for summary judgment.

The Court heard oral argument on the cross-motions on Monday, April 14, 2003.

## II. STANDARDS OF LAW

### A. Summary Judgment

The standard for summary judgment is well known. Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

The outcome of this case does not turn on facts, for it ultimately presents a pure question of law, *i.e.,* whether a federal statute that narrowly defines the term "wetland" preempts a local ordinance that broadly defines "wetland." As such, this matter is "an excellent candidate for summary judgment. ...." *Valdez v. Hunt and Henriques,* 2002 WL 433595, at * 2 (N.D.Cal. March 19, 2002). *See also Smith v. Califano,* 597 F.2d 152, 155 n. 4 (9th Cir.1979), *cert. denied sub nom. Smith v. Harris,* 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979) (stating that summary judgment is appropriate where the sole dispute concerns the proper interpretation of statutes and regulations).

### B. Federal Preemption

■■■ The Supremacy Clause, U.S. Const. Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to, federal law." *National Audubon Society, Inc. v. Davis,* 307 F.3d 835, 851 (9th Cir. 2002) (citation and internal quotation marks omitted). Federal preemption may be divided into three categories: (1) express preemption; (2) conflict preemption; and (3) field preemption. *See id.* Express preemption occurs when Congress states expressly, within the federal statute, its intention to preempt state law. Conflict preemption is implied whenever compliance with both the federal and state law is physically impossible or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC America Corp.,* 490 U.S. 93, 100–101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). Field preemption occurs whenever federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *See Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).[3]

■■■ Ultimately, the question of preemption turns on whether there is clear and manifest evidence of Congressional in-

**3.** The Plaintiff has not alleged field preemp- tion.

tent to supplant state authority. *See id.* Furthermore, there is a presumption against preemption in areas historically regulated by the States. *See Gregory v. Ashcroft,* 501 U.S. 452, 460–461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

## III. DISCUSSION

The parties' cross-motions present three issues: (1) whether Turecek has standing; (2) whether Turecek's claim is moot; and (3) whether the Swampbuster definition of "wetland" preempts the RPO definition of "wetland."

### A. Standing

The Court thoroughly addressed this issue and resolved it in the Plaintiff's favor in the Order of December 20, 2002. *See* Order of December 20, 2002 at 5–6.

### B. Mootness

 On January 15, 2003, the County denied the Plaintiff's long pending application for a major use permit. The County contends that the denial has rendered the Plaintiff's claim moot. Since the January 15th denial, however, the Plaintiff has filed an application for a major use permit to construct an orchard on his property. This second application triggers the RPO and raises the same legal issues at stake in the first application. *See* RPO Art. III, ¶ 3. Thus, a dismissal on the ground of mootness would serve only to delay the resolution of the important preemption question at issue herein.

Moreover, the denial of the Plaintiff's initial application does not cure the uncertainty that exists concerning what uses he can make of his property. As the Court noted in the Order of December 20, 2002, this uncertainty is the source of a cognizable injury to the Plaintiff: it diminishes the value of his property. *See* Order of December 20, 2002 at 5. Therefore, the Court finds that this case is not moot.

## C. Federal Preemption

### 1. Legislation Passed Pursuant to the Spending Clause does not Preempt the Laws or Regulations of an Unconsenting State and its Political Subdivisions.

 In the moving papers, both parties immediately dive into preemption analysis without considering a fundamental (and, in the Court's opinion, the decisive) question in this case: upon which Article I power did Congress rely to adopt the Swampbuster provisions? The answer is the spending power. *See United States v. Dierckman,* 201 F.3d 915, 922 (7th Cir. 2000) ("The FSA is not an exercise of direct regulatory power; instead, the FSA conditions the receipt of USDA farm benefits on the preservation of wetlands. This is indirect regulation invoking the spending power . . . . Even though Congress may lack the authority to regulate directly a strictly intrastate wetland, the incentive provided by the [FSA] is a valid exercise of the spending power."). As the following paragraphs illustrate, a law enacted under the Spending Clause does not automatically preempt state law or local regulations.

 Congress routinely employs the spending power to extend its reach beyond the confines of the limited and enumerated powers contained in Article I of the Constitution. "[T]he power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution. Thus, objectives not thought to be within Article I's enumerated legislative fields may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (citation and internal quotation marks omitted). In this manner, Congress may purchase what it lacks the authority to compel.

The Supreme Court has "repeatedly characterized ... Spending Clause legislation as 'much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Barnes v. Gorman,* 536 U.S. 181, 122 S.Ct. 2097, 2100–2101, 153 L.Ed.2d 230(2002) (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). Thus, "the legitimacy of Congress' power to legislate under the spending power ... rests on whether the [recipient] *voluntarily and knowingly accepts* the terms of the 'contract.'" *Id.* (emphasis added).

In the instant case, the recipient of the federal funds was a private individual, Turecek. Neither the State of California nor its political subdivision,[4] the County of San Diego, received funding under the Swampbuster provisions. In other words, neither the State nor the County were parties to the "contract" between Turecek and the federal government. Thus, though Turecek is bound to the terms of Swampbuster, the State and County are not. The Constitution can condone no other conclusion, for if a private citizen could bind unconsenting States to the terms of legislation enacted under the Spending Clause, then the concept of federalism would be a dead letter.

It follows, therefore, that—unlike Commerce Clause legislation—a law enacted under the Spending Clause must lack preemptive effect over the policy choices of unconsenting States. Many Circuits have reached this conclusion. *See, e.g., Environmental Defense Center, Inc. v. U.S. E.P.A.,* 319 F.3d 398, 412–413 (9th Cir. 2003) ("Under the *spending power,* Congress may seek to influence a State's policy choices by attaching *conditions* on the receipt of federal funds.... And where

Congress is authorized to regulate private activity under the *Commerce Clause,* it may offer States the choice of regulating that activity according to federal standards or having state law *preempted* by federal regulation." (emphasis added and citation omitted)); *Hodges v. Thompson,* 311 F.3d 316, 320 (4th Cir.2002) ("Congress may use its *Spending Power* to influence a State's legislative choices by providing *incentives* ... [or] Congress, under the *Commerce Clause,* may offer the States a choice of regulation under federal control or *preemption* under federal regulation." (emphasis added)); *United States v. Faasse,* 265 F.3d 475, 503–504 (6th Cir.2001) ("Congress may, pursuant to its *spending power, influence* a state's regulatory decisions [or] ... Congress may, of course, *preempt* outright state laws regulating activity that is within the *enumerated powers* of the Constitution."); *A.C.O.R.N. v. Edwards,* 81 F.3d 1387, 1393 n. 13 (5th Cir.1996)("[U]nder its *spending power,* Congress may attach to the receipt of federal funds conditions that have the effect of *influencing* state legislative choices. Further, where Congress may regulate pursuant to its *Commerce Clause* power ... [it may] hav[e] state law *preempted* by federal regulation." (emphasis added and citation omitted)). *See also O'Brien v. Massachusetts Bay Transp. Auth.,* 162 F.3d 40, 43 (1st Cir.1998)("[I]f this were a situation in which the federal sovereign had invoked the spending power to justify the preemption over the laws of a state that had eschewed federal funds, we could not dismiss lightly the state court's intuition about the awkwardness of asserting preemption solely on the basis of Congress' exercise of that power."); David E. Engdahl, *The Spending Power,* 44 Duke L.J. 1, 92 (1994) ("The Constitution does

4. In California, a county is defined as "the largest political subdivision of the State hav-

ing corporate powers." Cal. Gov't.Code § 23000.

not contemplate that federal regulatory authority should tag along after federal money like a hungry dog.").

Because Swampbuster was enacted under the Spending Clause, the Court holds that it does not preempt the RPO. On this ground, the Court DENIES the Plaintiff's motion for summary judgment and GRANTS the Defendant's motion for summary judgement.

### 2. Even If Spending Clause Legislation Could Have Preemptive Force over the Laws or Regulations of an Unconsenting State, There Is No Clear and Manifest Evidence That Congress Intended for Swampbuster to Supplant State and Local Authority to Regulate Wetlands.

As noted previously, to qualify as "wetland" under Swampbuster, property must possess three components: (1) hydric soils, (2) wetland hydrology, **and** (3) hydrophytic vegetation. *See* 16 U.S.C. § 3801(a)(18). The RPO definition of "wetland" is far broader in scope, encompassing any property that contains: (1) hydric soils, (2) wetland hydrology, **or** (3) hydrophytic vegetation.

#### a. Express Preemption

■ No party finds express preemption in the Swampbuster provisions. The Plaintiff, however, contends that a federal regulation expressly preempts the wetlands provision of the RPO. In support, the Plaintiff relies upon preamble language in a Department of Agriculture *interim* rule,[5] which states that "the provisions of this interim rule preempt state and local laws to the extent such laws are *inconsistent* with this interim final rule." Highly Erodible Land and Wetland Conservation, 61

Fed.Reg. 47,019, 47,019 (Sept. 6, 1995) (emphasis added).

There are three problems with the Plaintiff's argument. First, the *final* rule does not contain the language of express preemption found in the interim rule. *Compare id. with* 7 C.F.R. pt. 12. Second, the RPO definition of "wetland" is not inconsistent with the federal definition, for there is no scenario under which a party's compliance with the RPO triggers noncompliance with Swampbuster. To the contrary, if one conforms to the RPO wetland guidelines, one necessarily complies with Swampbuster. This type of regulatory scheme is commonplace in the field of environmental regulation, where the federal government often establishes a *minimum* national standard and leaves the States free to adopt more stringent protections. *See, e.g.,* 16 U.S.C. § 1535(f) (provision of Endangered Species Act empowering states to provide greater protection to endangered animals); 33 U.S.C. § 1370 (provision of Clean Water Act allowing states to enact stricter water pollution controls); 42 U.S.C. § 7416 (provision of Clean Air Act permitting states to adopt higher air quality standards).

Finally, Congressional intent—rather than agency intent—determines whether a regulation has preemptive force. There is explicit evidence in the legislative history that Congress did not intend for regulations enacted pursuant to Swampbuster to preempt state law. *See* H.R. Rep. 99–271(I), at 88, U.S.Code Cong. & Admin.News, 1985, at 1103, 1192 ("The Swampbuster provisions 'do[ ] not, nor [were they intended to] authorize the Secretary [of Agriculture] to regulate the use of private, or non-federal land.'").

---

**5.** Congress has empowered the Department of Agriculture to promulgate regulations under the FSA. The regulations incorporate the FSA's definition of "wetland." *See* 7 C.F.R. § 12.2 ("Definitions").

### b. Conflict Preemption

The Plaintiff also maintains that the RPO definition of "wetland" is implicitly preempted under the doctrine of conflict preemption. Specifically, the Plaintiff contends that the RPO stands as an obstacle to the purpose Congress sought to achieve through its agricultural statutes and regulations. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 11–12. The RPO, Turecek argues, frustrates "the goals of federal agricultural policy, which are to ensure the stability and abundance of the national food supply." *Id.* at 13. The Court disagrees. As Congress noted when it enacted the Swampbuster provisions, "in the present time of surplus agricultural production there is certainly no need for the conversion of more resources into agricultural production especially when ... wetland resources have such inherent value...." H.R. Rep. 99–271(I), at 87, U.S.Code Cong. & Admin.News, 1985, at 1103, 1191. Moreover, in the unlikely event that state environmental regulations come to pose a threat to the nation's food supply, Congress is free to respond by enacting a law that expressly preempts those regulations.[6]

The goal of the FSA was merely to deny federal agricultural subsidies to individuals or entities who choose to farm wetlands:

> This program will not halt the conversion of the nation's wetlands nor will it restore those wetlands now altered. However, this program will help better focus federal resources, restrain the decline of our wetland heritage and ensure that taxpayer funds devoted to a strong and prosperous agriculture are not inadvertently subsidizing improper wetland conversion.

*Id.* at 89, U.S.Code Cong. & Admin.News, 1985, at 1103, 1193. Presumably, efforts to completely halt the conversion of wetlands must be undertaken by state and local governments, if at all. This is in keeping with the traditional division of labor between the States and the federal government. *See, e.g., City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 115 S.Ct. 1776, 1785, 131 L.Ed.2d 801 (1995) ("It is obvious that land use ... is an area traditionally regulated by the States, rather than Congress, and that land use regulations ... are peculiarly within the province of state and local legislative authorities." (citation and internal quotation marks omitted)).

Thus, even if Spending Clause legislation could have preemptive force over the laws or regulations of an unconsenting State and its political subdivisions, there is no clear and manifest evidence that Congress intended (explicitly or implicitly) for Swampbuster to supplant state and local authority to regulate wetlands.

## IV. CONCLUSION

The Court DENIES the Plaintiff's motion for summary judgment and GRANTS the Defendant's motion for summary judgment on the ground that Spending Clause legislation such as Swampbuster lacks preemptive force over the laws and regulations of unconsenting States and their political subdivisions.

Alternatively, the Court DENIES the Plaintiff's motion for summary judgment and GRANTS the Defendant's motion for summary judgment on the ground that there is no clear and manifest evidence of Congressional intent to supplant state and local authority to regulate wetlands. This case is CLOSED.

IT IS SO ORDERED.

---

6. The Court expresses no opinion whether Congress has the power to enact such a law.