307 F.3d 835
 NATIONAL AUDUBON SOCIETY, INC.; Golden Gate Audubon Society, Inc.; Marin Audubon Society, Inc.; Muir Beach Enviro, Inc.; California Waterfowl Association, Inc., Plaintiffs-Appellees, and
National Trappers Association, Inc.; California Trappers Association, Inc.; Tim Wion; Christopher S. Brennan; Loyd E. Horn, Intervenors,
v.
Gray DAVIS, Governor of California; Douglas Wheeler, Resources Secretary, State of California; Jacqueline E. Schafer, Director, CDFG; California Department of Fish & Game; California Fish & Game Commission, Defendants, and
Ann M. Veneman,* U.S. Department of Agriculture; Gary Simmons, California State Director, Wildlife Services, U.S. Department of Agriculture; Jamie Clark Rappaport, Director, U.S. Fish and Wildlife Service; Anne Badgley, Regional Director, U.S. Fish and Wildlife Service, Appellees,
Am Soc Prev Cruelty; Protect Pets and Wildlife/Vote Yes on Proposition 4; Animal Protection Institute; The Ark Trust, Inc.; Doris Day Animal League; The Fund for Animals; The
Humane Society of the UNITED STATES; International Fund for Animal Welfare, Defendants-Intervenors-Appellants.
National Audubon Society, Inc.; Golden Gate Audubon Society, Inc.; Marin Audubon Society, Inc.; Muir Beach Enviro, Inc.; California Waterfowl Association, Inc., Plaintiffs, and
National Trappers Association, Inc.; California Trappers Association, Inc.; Tim Wion; Christopher S. Brennan; Loyd E. Horn, Intervenors-Appellants,
v.
Gray Davis, Governor of California; Douglas Wheeler, Resources Secretary, State of California; Jacqueline E. Schafer, Director, CDFG; California Department of Fish & Game; California Fish & Game Commission, Defendants-Appellees, and
Ann M. Veneman, U.S. Department of Agriculture; Gary Simmons, California State Director, Wildlife Services, U.S. Department of Agriculture; Gale A. Norton, Secretary, U.S. Department of the Interior; Jamie Clark Rappaport, Director, U.S. Fish and Wildlife Service; Anne Badgley, Regional Director, U.S. Fish and Wildlife Service; Robert Stanton, Director, National Park Service, Appellees,
Am Soc Prev Cruelty; Protect Pets and Wildlife/Vote Yes on Proposition 4; Animal Protection Institute; The Ark Trust, Inc.; Doris Day Animal League; The Fund for Animals; The Humane Society of the United States; International Fund for Animal Welfare, Defendants-Intervenors-Appellees.
National Audubon Society, Inc.; Golden Gate Audubon Society, Inc.; Marin Audubon Society, Inc.; Muir Beach Enviro, Inc.; California Waterfowl Association, Inc., Plaintiffs-Appellees,
v.
Gray Davis, Governor of California; Mary D. Nichols, Resources Secretary, State of California; Robert C. Hight, Director of the California Department of Fish and Game; California Department of Fish and Game; California Fish & Game Commission, Defendants-Appellants,
Ann M. Veneman, Secretary, U.S. Department of Agriculture; Gary Simmons, California State Director, Wildlife Services, U.S. Department of Agriculture; Gale A. Norton,** Secretary, U.S. Department of the Interior; Jamie Clark Rappaport, Director, U.S. Fish and Wildlife Service; Robert Stanton, Director, National Park Service, Appellees,
American Society for the Prevention of Cruelty to Animals; Animal Protection Institute; The Ark Trust, Inc.; Doris Day Animal League; The Fund for Animals; Humane Society of the United States; Protect Pets and Wildlife/Vote Yes on Proposition 4; The International Fund for Animal Welfare, Defendants-Intervenors-Appellees.
 No. 01-15159.
 No. 01-15216.
 No. 01-15321.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 9, 2002.
 Filed September 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Laurens H. Silver, California Environmental Law Project, Mill Valley, CA; John McCaull, National Audubon Society, Sacramento, CA, for the plaintiffs-appellees.
 National Audubon Society, et al. Katherine Barton, U.S. Department of Justice, Washington, DC, for appellee United States Department of Agriculture.
 Clifford T. Lee, California Attorney General, San Francisco, CA, for defendants-appellees-appellants Gray Davis, et al.
 Richard D. Gann & George Hunlock, Marvin Morrow & Hunlock, San Diego, CA; John L. Staley, Poway, CA, for intervenors-appellants National Trappers Association, et al.
 Eric R. Glitzenstein & Jonathan R. Lovvorn, Meyer & Glitzenstein, Washington, DC; Francis M. Goldsberry II, Goldsberry, Freeman & Swanson, Sacramento, CA, for defendants-intervenors-appellants-appellees American Society for the Prevention of Cruelty to Animals, et al.
 Appeal from the United States District Court for the Northern District of California; Charles A. Legge, District Judge, Presiding. CV-98-04610-CAL.
 Before GOODWIN, THOMAS and W. FLETCHER, Circuit Judges.
 OPINION
 WILLIAM A. FLETCHER, Circuit Judge.
 
 
 1
 This case pits bird-lovers, seeking to protect endangered and threatened species, against fox-lovers, seeking to protect predators from inhumane traps. The action is a challenge to Proposition 4, adopted by California voters in November 1998 to protect wildlife and domestic pets by restricting use of certain kinds of traps. Five different groups of parties are involved in this litigation. The National Audubon Society and other associations with similar interests ("Audubon") brought suit against various California state officials and agencies (the "state parties"). Audubon's complaint also names several federal officials as necessary parties (the "federal parties").[1] The sponsors and other supporters of Proposition 4 intervened (the "sponsors") to defend Proposition 4.[2] Finally, the National Trappers Association, the California Trappers Association, and several individual trappers (the "trappers") intervened and filed a separate complaint challenging Proposition 4.
 
 
 2
 The state parties and sponsors appeal the district court's summary judgment granting declaratory relief to the Audubon plaintiffs on the ground that relevant portions of Proposition 4 are preempted by the federal Endangered Species Act ("ESA"), Migratory Bird Treaty Act ("MBTA"), and National Wildlife Refuge System Improvement Act ("NWRSIA"). The trappers appeal the district court's dismissal of their claims that Proposition 4 is unconstitutional, and that it is preempted by the ESA and the Animal Damage Control Act ("ADCA"), for lack of standing. We affirm in part, reverse in part, and remand for further proceedings.
 
 I. Background
 
 3
 California voters passed Proposition 4 on November 3, 1998, enacting California Fish & Game Code § 3003.1[3] and § 3003.2, which, broadly speaking, ban the use of certain traps and poisons to capture or kill wildlife in the state. Proposition 4 also authorizes criminal prosecution for violation of these subsections, punishable by fines and/or imprisonment. Cal. Fish & Game Code § 12005.5.
 
 
 4
 A. Impact of Proposition 4 on Trapping Practices
 
 
 5
 On November 6, 1998, two days after the passage of Proposition 4, the California Department of Fish and Game ("DFG") issued a press release describing Proposition 4. It announced that the new law "makes it generally illegal to trap fur-bearing and non-game animals with commonly used traps and to buy, sell, or exchange the fur of mammals that have been captured with these traps." The press release further stated that, "DFG and other governmental agencies will now have to use traps other than leg-hold traps to control predators, including those that prey on threatened and endangered species in California." It instructed individuals affected by Proposition 4 to follow its provisions where they conflict with existing trapping regulations.
 
 1. Impact on Individual Private Trappers
 
 6
 As a result of Proposition 4 and DFG's press release, many individual private trappers, including individual trapper-intervenors and other members of the trapper organizations, stopped using leghold traps. Prior to the passage of Proposition 4, these trappers engaged in trapping for recreation, for interstate commerce in fur, and for protection of property and endangered animals. Their activities included trapping conducted under contracts with state, local, and federal governments, in order to protect everything from levees, to livestock, and to the California least tern. Since issuing the press release more than two years ago, the DFG has made no further public announcements regarding enforcement of Proposition 4. One individual private trapper has been arrested and prosecuted for violation of Proposition 4.[4]
 
 2. Impact on Federal Trapping
 
 7
 In the past, various federal agencies, including the U.S. Department of the Interior, Fish and Wildlife Service ("FWS") and the U.S. Department of Agriculture, Animal and Plant Health Inspection Service ("USDA/APHIS"), have used leghold traps in California. Prior to the passage of Proposition 4, federal agencies used leghold traps to protect livestock and other property pursuant to the ADCA, 7 U.S.C. §§ 426-426c. Leghold traps were also used to protect threatened or endangered species — including California clapper rails, western snowy plovers, least terns, and salt marsh harvest mice—from predators, pursuant to the ESA, 16 U.S.C. §§ 1531-44. They were also used to protect a variety of bird species — including herons, egrets, terns, gulls, and other nesting species — pursuant to the MBTA, 16 U.S.C. §§ 703-712. Within the National Wildlife Refuge System, trapping also took place under the authority of the NWRSIA, 16 U.S.C. § 668dd. Specific federal conservation activities included leghold trapping to capture non-native red foxes in the San Francisco Bay National Wildlife Refuge ("San Francisco Bay Refuge"), and to capture muskrats in the Klamath Basin National Wildlife Refuge Complex. In both places, federal authorities believe that leghold traps are uniquely effective.
 
 
 8
 The state parties assert that the United States has not identified any refuge where federal trapping was conducted solely to protect MBTA species, but they concede that federal trapping to protect both MBTA- and ESA-listed species has occurred at the aforementioned wildlife refuges. For at least one of the trapping locations in the San Francisco Bay Refuge, predator management efforts were primarily directed at protecting MBTA-listed species, though trapping activities in that refuge were generally undertaken under the authority of the ESA.
 
 
 9
 During the initiative campaign for Proposition 4, the USDA took a strong position against it, even contributing to the ballot arguments against the initiative. Immediately after the passage of Proposition 4, the federal agencies that used leghold traps in California responded in different ways. FWS decided to continue its leghold trapping program. On the other hand, USDA/APHIS removed all of its traps and declared its intention not to place traps where it might otherwise have done so. The Audubon appellees state in their brief that USDA officials believed themselves obligated to remove the traps under federal Animal Damage Control Directive 2450, which requires that use of traps comply with applicable state laws, except where specific exemptions are obtained. Gary Simmons, USDA/APHIS's director for California, stated in his affidavit that the agency removed all leghold traps due to the danger of criminal liability and because it was agency policy to comply with all applicable state laws.
 
 B. Audubon's Suit
 
 10
 Audubon and like-minded plaintiff-appellees are five non-profit organizations that support the protection and conservation of bird life. It is uncontested that their members use wetlands throughout the United States, California, and the San Francisco Bay Area for bird and wildlife observation, nature photography, aesthetic enjoyment, and other scientific, educational, and recreational activities. Some members also help to manage and finance related conservation efforts.
 
 
 11
 On December 3, 1998, the Audubon plaintiffs filed their complaint for declaratory and injunctive relief, challenging only California Fish & Game Code § 3003.1(c), which bans "the use of any steel-jawed leghold trap" by "any person, including an employee of the federal ... government." They argue that if fewer predator mammals are trapped, more such mammals will be alive to prey on birds. They contend that § 3003.1(c) is preempted by the ESA, MBTA, and NWRSIA.
 
 C. Trappers' Claims
 
 12
 The plaintiff-intervenor trappers consist of both trapper associations and individual trappers. The associations are devoted to the welfare of their members and to the promotion of conservation techniques in the management of fur-bearing animals. Members of the associations trap within California and engage in interstate commerce in furs. Individual trappers have privately trapped with leghold traps; engaged in interstate commerce in furs; used leghold traps to protect crops and livestock; worked as trappers for Animal Damage Control (under the USDA); and trapped as independent contractors for the state to protect levees.
 
 
 13
 On April 2, 1999, the district court granted the trappers' motion to intervene in Audubon's suit. In addition to challenging subsection 3003.1(c), the trappers challenged subsection (a)—banning the use of body-gripping traps "for the purposes of recreation or commerce in fur"—and subsection (b)—banning the purchase, sale, or exchange of raw fur from animals trapped in California using body-gripping traps. Specifically, the trappers contended that those subsections violate the Commerce Clause; that Proposition 4's misleading ballot material violated due process; and that Proposition 4 is pre-empted by the ESA, MBTA, and ADCA. The trappers also sought declaratory and injunctive relief.
 
 D. District Court Proceedings
 
 14
 The district court issued a temporary restraining order on January 8, 1999, and a preliminary declaratory order on February 3, 1999. Reflecting the proposed language of the parties (excluding the trappers who had not yet intervened), the preliminary declaratory order stated that § 3003.1(c)
 
 
 15
 was not intended to apply, and does not apply, to the use of padded leg-hold traps on federal or nonfederal land by a federal employee, a contractor of a federal agency, or a person acting pursuant to the authority or direction of a federal agency, for the purpose of conserving an endangered or threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531-1544.
 
 
 16
 This order reflects the parties' limited agreement that Proposition 4 cannot be applied to ESA-related trapping. Audubon wanted the preliminary order to cover MBTAas well as ESA-based trapping, and wanted the legal basis of the order to be federal preemption. The state parties were willing to stipulate only to the limited order issued by the court, which appears to make Proposition 4 inapplicable to ESA trapping only as a matter of statutory interpretation of Proposition 4 itself. After entry of the preliminary order, the parties agreed to limit discovery to issues related to MBTA-related trapping to the extent that it was separate from ESA-related trapping. Shortly after entry of the preliminary order, USDA/APHIS put back in place those traps that had been used to protect federally listed threatened and endangered species at wildlife refuges in California.
 
 
 17
 In its final order, issued November 30, 2000, the district court held that the Audubon plaintiffs had standing, granted their motion to amend their complaint to add a preemption claim under NWRSIA, and granted their motion for summary judgment. The court granted a declaratory judgment holding that § 3003.1(c)'s leghold-trap ban violated the Property Clause of the Constitution and the NWRSIA, and was preempted by federal conservation efforts under the ESA and MBTA. However, the court declined to grant injunctive relief against the state parties because "[t]here is no present threat of enforcement of the statute against federal wildlife trapping." The court denied the state parties' and sponsors' motions for summary judgment. Finally, the court dismissed with prejudice the trappers' claims, concluding that the trappers lacked standing because of the lack of an imminent "threat of prosecution," and that, in any event, their due process and Commerce Clause claims failed on the merits.
 
 
 18
 The state parties, the sponsors, and the trappers all appeal.
 
 
 19
 II. The State Parties' and the Sponsors' Appeal Against Audubon
 
 A. Eleventh Amendment Immunity
 
 20
 The district court found that the Eleventh Amendment did not deprive it of jurisdiction to hear Audubon's claims for declaratory and injunctive relief based on the "time-tested principle of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)." We review de novo whether Eleventh Amendment immunity applies. See State of California v. Campbell, 138 F.3d 784, 786 (9th Cir.1998).
 
 
 21
 The state parties assert that the Eleventh Amendment bars all of Audubon's claims, given the district court's finding that there is no present threat of enforcement. According to the state parties, the Ex Parte Young exception "require[s] a genuine threat of enforcement by a state official before a federal court" can hear a party's claims. Essentially, the state argues that we should recognize a "ripeness" component in the Ex Parte Young exception, and cites numerous cases in support of that argument, including Snoeck v. Brussa, 153 F.3d 984, 987 (9th Cir.1998); Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir.1992); Los Angeles Branch NAACP v. Los Angeles Unified School District, 714 F.2d 946, 953 (9th Cir.1983); Okpalobi v. Foster, 244 F.3d 405, 417 (5th Cir.2001) (en banc) (holding that "any probe into the existence of a Young exception should gauge (1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute" (emphasis added)); and Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1415 (6th Cir.1996) (holding that "Young does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute").
 
 
 22
 However, the cases cited by the state parties primarily address the question of whether a named state official has direct authority and practical ability to enforce the challenged statute, rather than the question of whether enforcement is imminent. These cases are concerned with plaintiffs circumventing the Eleventh Amendment under Ex Parte Young simply by suing any state executive official. That is, they are concerned with the question of "who" rather than "when." See, e.g., L.A. Branch NAACP, 714 F.3d at 953(finding that the governor lacked power to remedy alleged violations); Okpalobi, 244 F.3d at 417(finding lack of an enforcement connection between abortion statute and the governor or attorney general); Children's Healthcare, 92 F.3d at 1417 (finding that the attorney general "has no connection to enforcement of the statute"). We decline to read additional "ripeness" or "imminence" requirements into the Ex Parte Young exception to Eleventh Amendment immunity in actions for declaratory relief beyond those already imposed by a general Article III and prudential ripeness analysis. The Article III and prudential ripeness requirements, which we apply infra Part II.B.2, are tailored to address problems occasioned by an unripe controversy. There is thus no need to strain Ex Parte Young doctrine to serve that purpose.
 
 
 23
 Based on this view, we hold that suit is barred against the Governor and the state Secretary of Resources, as there is no showing that they have the requisite enforcement connection to Proposition 4. The two state agencies are also immune from suit because they are state entities, not individual state officers. However, the Eleventh Amendment does not bar suit against the Director of the California Department of Fish & Game, who has direct authority over and principal responsibility for enforcing Proposition 4.
 
 
 24
 The fact that only declaratory, rather than injunctive, relief may be available does not alter this conclusion. Under the principle of Ex Parte Young, private individuals may sue state officials for prospective relief against ongoing violations of federal law. See Ex Parte Young, 209 U.S. at 159-60, 28 S.Ct. 441. As subsequent cases have pointed out, Ex Parte Young itself was decided well before declaratory relief was available in the federal courts. See Steffel v. Thompson, 415 U.S. 452, 466-67, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (explaining that the 1934 Declaratory Judgment Act was passed "to provide a milder alternative to the injunction remedy" (citation omitted)). Nevertheless, we have long held that the Eleventh Amendment does not generally bar declaratory judgment actions against state officers. See, e.g., Agua Caliente Band of Cahuilla Indians v. Hardin, 223 F.3d 1041 (9th Cir.2000) (applying Ex Parte Young exception to declaratory relief against state board of equalization); Los Angeles Bar Assoc. v. Eu, 979 F.2d 697, 704 (9th Cir.1992) (holding that "the Eleventh Amendment presents no barrier to the Bar Association's request for declaratory relief against an alleged ongoing violation of federal law"); see also Balgowan v. New Jersey, 115 F.3d 214 (3rd Cir.1997) (finding jurisdiction to hear FSLA claim for declaratory relief against state commissioner under Ex Parte Young exception). The only question is whether the declaratory action is seeking prospective, rather than retrospective, relief.[5] See, e.g., Eu, 979 F.2d at 704 ("[T]he Eleventh Amendment does not bar action seeking only prospective declaratory or injunctive relief against state officers in their official capacities. (emphasis added)).
 
 
 25
 The Supreme Court's holding in Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), is consistent with the view we take in this case. In Green, the Court refused to allow a declaratory judgment because "the issuance of a declaratory judgment ... would have [had] much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." Id. at 73., 106 S.Ct. 423 In other words, a judgment in that case would have amounted to an award of retrospective relief. In a case such as this one, declaratory relief is not an "end run" around Green or Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (barring retroactive payment of moneys owed under the Eleventh Amendment), for it has no retrospective effect; rather it has purely prospective effect, either of its own force or as a basis for future injunctive relief. Audubon simply seeks a declaration that § 3003.1(c) is preempted and cannot be enforced by state officials against federal trapping efforts in the future. As long as the relief is truly prospective in nature, as it is here, the Ex Parte Young exception to Eleventh Amendment immunity applies to declaratory relief against state officials, just as it applies to injunctive relief. Accordingly, we hold that there is no Eleventh Amendment bar to Audubon's suit for declaratory relief against the Director of the California Department of Fish and Game.
 
 
 26
 B. Article III "Case or Controversy"
 
 
 27
 Before reaching the merits, we address the justiciability of Audubon's claims.
 
 1. Standing
 
 28
 We determine standing under Article III de novo. See Stewart v. Thorpe Holding Co., 207 F.3d 1143, 1148(9th Cir.2000). Under current Supreme Court case law, Audubon must demonstrate three elements, which are said to constitute the "irreducible constitutional minimum" of Article III standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
 
 
 29
 First, a plaintiff must have suffered an "injury-in-fact" to a legally protected interest. The injury must be both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical." Id. at 560, 112 S.Ct. 2130 (citation omitted). Second, there must be a causal connection between the injury and the challenged statute. Id. Third, it must be likely that the injury will be "redressed by a favorable decision." Id. at 561, 112 S.Ct. 2130 (internal quotation marks and citation omitted).
 
 
 30
 The state argues that the district court erred in finding standing for the Audubon plaintiffs. Because the Audubon plaintiffs are associations they may have standing only if they can meet the three-part organizational standing test:
 
 
 31
 [W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 32
 United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (quoting Hunt v. Wash. State Apple Adv. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Only the first part is in dispute in this case.
 
 
 33
 The state parties contend that Audubon's claim of injury is derivative of injury to the United States, and that Audubon must therefore show that the United States suffered injury-in-fact from a "threat of enforcement" by the state appellants. The federal parties argue, contrary to the finding of the district court, that the federal government faced a "threat of prosecution" sufficient to support standing. However, we agree with the district court's reasoning, which premised standing on a straightforward application of Article III's standing requirements to Audubon itself, rather than through the United States.
 
 
 34
 First, we hold that Audubon alleged sufficient injury to the aesthetic, recreational, and scientific interests of its members in the observation of birds and other wildlife to satisfy the injury-in-fact requirement. See Lujan, 504 U.S. at 562-68, 112 S.Ct. 2130 (recognizing injury to aesthetic interests for standing purposes). The Audubon plaintiffs have demonstrated that their members enjoy and observe wildlife in a number of specific areas where federal leghold trapping has occurred. Injury to their interests was actual and imminent as soon as the traps were removed because the bird population was exposed to immediate risk of harm. Second, the plaintiffs' members' injury is "fairly traceable" to Proposition 4 because the federal government removed traps in direct response to Proposition 4 (whether under direct "threat of prosecution" or not). Removal of the traps leads to a larger population of predators, which in turn decreases the number of birds and other protected wildlife. This chain of causation has more than one link, but it is not hypothetical or tenuous; nor do appellants challenge its plausibility. See Autolog Corp. v. Regan, 731 F.2d 25, 31 (D.C.Cir.1984) (holding that what matters is not the "length of the chain of causation," but rather the "plausibility of the links that comprise the chain"). Finally, the members' injury is redressable because if Auubon wins on its preemption claims, the federal parties will resume their prior use of leghold traps, thereby redressing the injury by protecting the bird population. Lujan states that when "causation and redressability ... hinge on response of the regulated (or regulable) third party to the government action," more particular facts are needed to show standing. Lujan, 504 U.S. at 561-62, 112 S.Ct. 2130. But the federal government's response in this case is not in doubt. As evidenced by its resumption of trapping following the entry by the district court of its preliminary order in this case, it is clear that the federal government will resume its trapping activity if unconstrained by Proposition 4. The district court properly applied the three elements of the standing inquiry.
 
 
 35
 Contrary to the state parties' suggestion, there was no need to probe precisely why the federal government removed traps — whether due to an imminent threat of prosecution, general threat of prosecution, or its own desire to comply with state law—beyond the uncontested fact that the traps would not have been removed but for Proposition 4. The Audubon plaintiffs are not claiming an injury from threatened criminal prosecution, but rather injury from the fact that the federal authorities were complying with Proposition 4. The federal authorities' decision caused harm to Audubon; that decision was caused by Proposition 4; and Audubon had no ability to control that decision.
 
 2. Ripeness
 
 36
 We review ripeness questions de novo. See Natural Resources Defense Council v. Houston, 146 F.3d 1118, 1131 (9th Cir.1998). The state appellants argue that this panel should apply the "pre-enforcement challenge" test for ripeness set forth in Thomas v. Anchorage Equal Rights Commission, 220 F.3d 1134, 1139 (9th Cir.2000) (en banc). This would be the proper inquiry if the United States (rather than Audubon) had brought suit. However, Audubon is claiming injury not from threatened criminal prosecution, but rather from the federal agencies' cessation of trapping. Audubon's injury—stemming from the very real threat of loss of birds and other wildlife—existed at the time the suit was filed because the traps had been removed in response to Proposition 4. Thus, Audubon's claims are clearly ripe for decision under Article III.
 
 
 37
 In addition to applying the Article III ripeness requirement, we must determine whether the claims are prudentially ripe, based on two factors: (1) whether the issues are fit for judicial resolution and (2) the potential hardship to the parties if judicial resolution is postponed. See Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The first factor favors adjudication now because the specific facts surrounding possible actions to enforce the statute will not aid resolution of Audubon's federal preemption challenges to Proposition 4. Audubon's injury is established, and the legal arguments are as clear as they are likely to become. The second factor also favors adjudication. The USDA had removed all of its leghold traps in response to Proposition 4. Without the protection from predators that those traps provide, bird and other wildlife populations will decrease, thereby injuring Audubon's interest. We therefore conclude that Audubon's claims are sufficiently ripe under a prudential ripeness analysis as well.
 
 3. Mootness
 
 38
 We also review mootness de novo. See Smith v. Univ. of Wash. Law Sch., 233 F.3d 1188, 1193 (9th Cir.2000). Audubon's interests can be divided into two categories for purposes of mootness: protection of ESA-listed species, and protection of non-ESA species. The preliminary order, entered by the district court pursuant to the parties' stipulation, states that § 3003.1(c)
 
 
 39
 was not intended to apply, and does not apply, to the use of padded leg-hold traps on federal or nonfederal land by a federal employee, a contractor of a federal agency, or a person acting pursuant to the authority or direction of a federal agency, for the purpose of conserving an endangered or threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531-1544.
 
 
 40
 Appellants argue, in light of the order, that Audubon's suit is moot with respect to the ESA because Proposition 4 was held in the order not to apply to ESA-related trapping. Further, they argue, there is no ongoing injury to ESA-listed species since the traps have been put back. However, two factors weigh against mootness for ESA-listed species. First, the preliminary order, according to its own terms, expired upon the district court's entry of the final summary judgment and dismissal order giving rise to this appeal. Thus, the preliminary order is no longer in force. Second, the state's willingness to stipulate in this litigation that Proposition 4 does not apply to ESA-related trapping is not enough to moot the controversy. The state's stipulation is based on an interpretation of Proposition 4 rather than on federal preemption grounds, and the state is not constrained from later adopting a different interpretation; nor are the California state courts constrained from interpreting Proposition 4 differently. See Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc., 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("[T]here are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative too overcome mootness."); United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (establishing that defendants must show that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" to render a claim moot based upon their own voluntary conduct). Indeed, the state's interpretation appears contrary to the plain textual meaning of the statute, which specifically bans the use of leghold traps by federal employees, and makes no exception for the ESA. See Cal. Fish & Game Code § 3003.1(c). We therefore conclude that the ESA-preemption claim should not be dismissed as moot.
 
 
 41
 With respect to non-ESA-listed species, we further hold that the MBTA and NWRSIA preemption claims are not moot. The state parties are not willing to stipulate that Proposition 4 is inapplicable to MBTA-listed species or other non-ESA species found on NWRs. However, they argue that the MBTA-preemption claim should nevertheless be considered moot on the ground that trapping pursuant to the ESA already protects all of the MBTA-listed species. The state parties reason that if ESA trapping is permitted under Proposition 4, there would be no injury to MBTA-listed species, since they are protected by the same traps. Even if this assertion is true, however, Audubon's MBTA and NWRSIA claims are not mooted. The MBTA-listed species can shift locations away from the ESA-listed species, and predators can appear where no ESA-listed species are now present, thus giving rise to the need for separate traps to protect MBTA-listed species. In such cases, migratory birds could be killed by predators faster than courts could react and permit trapping; the injury, as the district court found, is thus "capable of repetition yet evading review." S. Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Audubon's NWRSIA preemption claims are not moot on the same rationale. Again, while the injury might be too speculative to support standing in a later suit, it is not too speculative to overcome mootness. See Friends of the Earth, 528 U.S. at 190, 120 S.Ct. 693.
 
 C. The Merits
 
 42
 We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. See Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir.2001). We review federal preemption questions de novo. See Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Calif., 159 F.3d 1178, 1180 (9th Cir.1998).
 
 
 43
 The Supremacy Clause of the Constitution, Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). Federal law can preempt state law in three ways. First, Congress may expressly preempt state law. Second, preemption may be inferred where Congress has occupied a given field with comprehensive regulation. Third, a state law is preempted to the extent that it actually conflicts with federal law. "Such a conflict arises when `compliance with both federal and state regulations is a physical impossibility.'" Id. (quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). This last type of preemption is at issue here. The Audubon plaintiffs claim that subsection § 3003.1(c), banning leghold traps, is preempted.
 
 1. Endangered Species Act (ESA)
 
 44
 The stated purpose of the ESA is principally "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA mandates that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c)(1). Specifically, the ESA provides that
 
 
 45
 [t]he terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management, such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.
 
 
 46
 16 U.S.C. § 1532(c)(3) (emphasis added).
 
 
 47
 Proposition 4 expressly prohibits any person, including federal employees, from using leghold traps, except for the protection of human health or safety. Its text makes no exception for endangered species under the ESA. As the district court determined, "[t]here is no probative evidence that any other meaning of that section was intended at the time Proposition 4 was approved, either in the Legislative Analyst's Digest and [sic] the voter pamphlet arguments made by the initiative's proponents." We agree with the district court that, to the extent § 3003.1(c) prevents federal agencies from protecting ESA-listed species, it is preempted by the ESA.[6]
 
 
 48
 The state parties argue that under their current construction of Proposition 4, as evidenced in the district court's preliminary declaratory order, § 3003.1(c) does not apply to federal trapping programs under the ESA. Since there is no conflict under the state's interpretation of Proposition 4, the state parties argue, there is no basis for preemption. We view the state parties' interpretation of Proposition 4 as an unlikely reading of the text, strongly influenced by their view of the preemptive reach of the ESA. We thus reject that interpretation as a basis for avoiding federal preemption.
 
 
 49
 The sponsors urge against preemption on another ground. They agree with the district court that Proposition 4 makes no exception for the protection of endangered species, but argue that, even without such an exception, it is not preempted by the ESA. They point to § 6(f) of the ESA, 16 U.S.C. § 1535(f), which provides:
 
 
 50
 Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter. This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.
 
 
 51
 (Emphasis added.)
 
 
 52
 The sponsors contend that the italicized sentence carves out an exception to the ESA that allows California, through Proposition 4, to "conserve" the animals that would be trapped by the leghold traps prohibited by the proposition. We do not read the sentence that way. It is clear from the sentence itself (note the use of the word "otherwise"), from the preceding and following sentences, and from the overall purpose of the ESA, that the sentence allows the state to pass laws and promulgate regulations that would conserve wildlife, but to do so only insofar as those laws and regulations are consistent with the protection of endangered species under the ESA. We do not read the italicized sentence to carve out an exception to the ESA that would allow the state to conserve wildlife that is not endangered (such as the fur-bearing predators in this case), when the effect of that conservation would be further to endanger species already listed as endangered under the ESA.
 
 2. Migratory Bird Treaty Act (MBTA)
 
 53
 The district court also found that § 3003.1(c) was preempted to the extent it "conflicts with the Secretary's ability to protect migratory birds under the MBTA." However, neither Audubon nor the federal parties attempt to defend the district court's holding of preemption under the MBTA. Instead, they both argue that there is no need to decide this issue if we find preemption under the NWRSIA. We agree and therefore move directly to that statute.
 
 
 54
 3. National Wildlife Refuge Systems Improvement Act (NWRSIA)
 
 
 55
 The district court permitted the Audubon plaintiffs to amend their complaint to add the NWRSIA as an additional ground of preemption. The court permitted the amendment more than a year after the case was filed, and after discovery had closed, finding prejudice to be minimal because Audubon was merely adding a new legal basis for preemption (which it had pled from the beginning), and because the amendment required additional legal research but not additional fact-gathering. We review a district court's grant of leave to amend for abuse of discretion. See United States v. McGee, 993 F.2d 184, 187 (9th Cir.1993). Given the district court's careful discussion and weighing of the advantages and disadvantages of granting leave, and the fact that additional factual discovery was not necessary to respond to the new legal argument, we hold that the district court did not abuse its discretion in permitting the amendment.
 
 
 56
 The district court held that § 3003.1(c) both (1) violates the Property Clause of the Constitution, and (2) is preempted by the NWRSIA, which derives its authority from the Property Clause. Neither Audubon nor the federal parties, however, defend on appeal the district court's holding that § 3003.1(c) violates the Property Clause. Because the trapping at issue occurs on NWRs, and appellees' injuries would thus be adequately addressed under NWRSIA preemption, we do not address the district court's broader holding under the Property Clause but consider only whether § 3003.1(c) is preempted by the NWRSIA.[7]
 
 
 57
 A recent decision by the Tenth Circuit provides guidance as to the relative scope of federal and state authorities under the NWRSIA. See Wyoming v. United States, 279 F.3d 1214 (10th Cir.2002). That court rejected Wyoming's attempt to vaccinate elk living in the National Elk Refuge, holding that the Tenth Amendment did not reserve to the State an unrestricted right to manage wildlife on public lands. The court held that Congress invoked federal power under the Property Clause when it enacted the NWRSIA, and that the NWRSIA "plainly vest[s] the FWS with authority to administer the Act and manage the NWRs." Id. at 1228. We agree. Because NWRs are federal government land, Congress has the authority under the Property Clause to preempt state action with respect to NWR management and has done so through the NWRSIA. We therefore hold that the NWRSIA preempts § 3003.1(c)'s regulation of federal trapping on NWRs in California because the ban on leghold traps conflicts with FWS's statutory management authority on those federal reserves.
 
 
 58
 The Tenth Circuit interpreted NWRSIA's savings clause, § 668dd(m), as reflecting Congress's intent for "ordinary principles of conflict preemption to apply in cases such as this." Id. at 1234. That clause provides:
 
 
 59
 Nothing in the Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System. Regulations permitting hunting or fishing of fish and resident wildlife within the System shall be, to the extent practicable, consistent with State fish and wildlife laws, regulations, and management plans.
 
 
 60
 16 U.S.C. § 668dd(m) (emphasis added). We agree with the Tenth Circuit that the first sentence of the savings clause was not meant to eviscerate the primacy of federal authority over NWR management. Rather, to the extent that actual conflict persists between state and federal policies, state law is preempted by the NWRSIA.
 
 
 61
 III. The Trappers' Appeal Against the State Parties and the Sponsors
 
 
 62
 Unlike the Audubon plaintiffs, the trappers challenge § 3003.1 in its entirety, not merely subsection 3003.1(c). As indicated in our Eleventh Amendment discussion, we have jurisdiction over the trappers' claims against the Director of California's Department of Fish and Game, but not against the Governor, state Secretary of Resources, or state agencies. See supra Part II.A.
 
 
 63
 We review de novo the trial court's dismissal of the trappers' claims under Federal Rule of Civil Procedure 12(b)(6). See Zimmerman v. City of Oakland, 255 F.3d 734, 737(9th Cir.2001). We accept all allegations of material fact stated in the complaint as true and construe the allegations in favor of the non-moving party. See Love v. United States, 915 F.2d 1242, 1245 (9th Cir.1989). A complaint will not be dismissed unless the non-moving party can prove no facts in support of its claim to relief. See id. De novo review applies to questions of standing, ripeness, and preemption. See supra Part II.
 
 
 64
 A. Article III "Case or Controversy"
 
 
 65
 As in our analysis of Audubon's claims, we first address the justiciability of the trappers' claims.
 
 1. Standing
 
 66
 The district court concluded that the trappers lacked standing under Article III because they failed to demonstrate "injury-in-fact." The district court conducted its standing analysis under the framework described in San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121, 1126-28(9th Cir.1996), and Thomas v. Anchorage Equal Rights Commission, 220 F.3d 1134, 1139 (9th Cir.2000) (en banc), to determine whether the trappers faced a "genuine threat of imminent prosecution" sufficient to establish injury in fact for a pre-enforcement challenge. Accordingly, the district court examined three factors: (1) the trappers' plans to violate the law; (2) the state's specific plans or threats to enforce the law; and (3) the history of actual enforcement of the law.
 
 
 67
 The district court appropriately took San Diego Guns and Thomas into account, but those cases do not compel the conclusion that the trappers lack standing under Article III. The three-factor test applied in both San Diego Guns and Thomas was premised on the plaintiffs' assertion that a "risk of prosecution" was the injury. The three factors of San Diego Guns and Thomas adequately ensure that courts will not decide cases in which a risk of prosecution is so remote that no "case or controversy" exists. For example, in Thomas, two landlords alleged risk-of-prosecution injury under Alaska housing laws based on their refusal to rent to unmarried couples. We held that the landlords lacked standing because they did not face a genuine threat of prosecution, given that they could not specify any past or planned refusals to rent to unmarried couples, that no complaint had ever been filed against them, and that the 25 year old laws had never resulted in a criminal prosecution. See Thomas, 220 F.3d at 1138-40.
 
 
 68
 In this case, however, the core of the trappers' injuries is not a hypothetical risk of prosecution but rather actual, ongoing economic harm resulting from their cessation of trapping. That is, the trappers allege direct financial loss caused by 14935 Proposition 4. When such tangible economic injury is alleged, we need not rely on the three-factor test applied in Thomas and San Diego Guns, for the gravamen of the suit is economic injury rather than threatened prosecution. Indeed, in San Diego Guns itself, we explicitly analyzed plaintiffs' assertion of standing based on an economic injury separately from our analysis of standing based on injury from threat of prosecution. We stated there, "[e]conomic injury is clearly a sufficient basis for standing. Nonetheless, plaintiffs' asserted financial injury here fails the second prong of the Lujan test; plaintiffs fail to demonstrate that their alleged economic injury is fairly traceable to the Crime Control Act." San Diego Guns, 98 F.3d at 1130 (citation omitted).[8] Here, by contrast, the trappers' economic injury is directly traceable to the fact that Proposition 4 explicitly forbids the trapping they would otherwise do.
 
 
 69
 In this case, the trappers satisfy all three requirements of Article III standing. First, the trappers suffered actual, discrete, and direct injury in fact in the form of financial losses incurred from the prohibition on trapping contained in Proposition 4. The trappers allege that several of the named trapper plaintiffs earned a living through trapping-related activities, and that cessation of trapping caused them economic harm.
 
 
 70
 Second, the trappers' economic injury is "fairly traceable" to the enactment of Proposition 4. Several factors support the trappers' expectation that Proposition 4 might be enforced against them and thus make their forbearance from trapping reasonable and "fairly traceable" to Proposition 4: (1) the newness of the statute; (2) the explicit prohibition against trapping contained in the text of Proposition 4; (3) the state's unambiguous press release mandating the removal of all traps banned under Proposition 4; (4) the amendment of state regulations to incorporate the provisions of Proposition 4; and (5) the prosecution of one private trapper under Proposition 4. The trappers' claims are notably different from those of the plaintiff in Shields v. Norton, 289 F.3d 832 (5th Cir.2002), where the Fifth Circuit found no actual controversy under Article III in a challenge to an asserted prohibition on pumping water in violation of the ESA. In the words of that court, "[Plaintiff's] claim that he stopped pumping water from the aquifer in response to [threats of litigation] might establish a controversy, if not for their emptiness exposed by years of inactivity since the alleged `threats' were made and the lack of evidence that a threat was in fact made[.]" Id. at 837.
 
 
 71
 Third, the trappers' injury is redressable. The trappers' uncontested history of using the now-prohibited traps before the passage of Proposition 4, and their statements that they would continue trapping if not constrained by the proposition, are enough to show that they would resume trapping if Proposition 4's ban were declared invalid.
 
 
 72
 We therefore conclude that the trappers have Article III standing to bring their claims. We note that this conclusion avoids the anomalous result that would otherwise be reached (and was reached by the district court), whereby the Audubon plaintiffs' injury to their aesthetic interest from Proposition 4 could demonstrate injury in fact, but the trappers' concrete economic injury from the same law could not.
 
 2. Ripeness
 
 73
 We hold that the trappers' suit satisfies both Article III and prudential ripeness concerns. From the foregoing discussion of injury in fact, it is clear not only that the trappers have suffered sufficient injury to satisfy Article III standing requirements, but also that the passage of Proposition 4, and the parties' positions with respect to its validity, have resulted in the creation of a sufficiently crystallized dispute that is ripe for purposes of Article III.
 
 
 74
 With respect to prudential ripeness, the first Abbott Labs factor — fitness for judicial resolution — favors adjudication now because more specific facts surrounding possible actions to enforce the statute will not aid resolution of the trappers' constitutional and statutory challenges to Proposition 4. The trappers' injury is established, and the legal arguments are as clear as they are likely to become. The second Abbott Labs factor—potential hardship to the parties—also favors adjudication. The trappers are refraining from trapping due to Proposition 4, and will continue to do so unless and until it is declared invalid. For so long as they refrain from trapping, they will suffer continuing economic injury. We therefore conclude that the trappers' claims are sufficiently ripe under a prudential ripeness analysis as well.
 
 B. Constitutional Claims
 
 75
 Despite the district court's dismissal of the trappers' claims for lack of standing, it nonetheless reached, and rejected, their two constitutional claims. We agree with the district court that these two claims fail on the merits.
 
 1. Commerce Clause Challenge
 
 76
 The trappers argue under two theories that Proposition 4 violates the Commerce Clause: (1) Proposition 4 directly regulates and discriminates against interstate commerce (a "per se" violation of the clause), and (2) Proposition 4 places an undue burden on interstate commerce in comparison to the law's putative benefits. The district court rejected the first theory on the ground that Proposition 4 had neither the purpose nor the effect of discriminating against interstate commerce within the meaning of the Supreme Court's Commerce Clause jurisprudence. We agree. A plain reading of § 3003.1(b) limits its application to furs from animals trapped inside California; it does not apply to furs from animals trapped outside the state. To the extent that Proposition 4 has any discriminatory effect, it would be in favor of interstate commercial activities undertaken by out-of-state actors. That is, trappers acquiring furs outside of California by means of leghold traps face no restriction on selling such furs in California. See Reynolds v. Buchholzer, 87 F.3d 827, 830 (6th Cir.1996) (recognizing that a ban on walleye fishing in Ohio would likely "act as a boon to out-of-state fisherman" who could sell their walleye in Ohio without local competition).
 
 
 77
 The district court rejected the second theory because it found that, if it reached the merits, Proposition 4 would not impose an undue burden on commerce. We agree with the district court on the merits. In order to establish a claim under the so-called dormant Commerce Clause, the trappers must show that the state law or regulation in question penalizes interstate commerce, and does so without sufficient economic justification. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."). There is unconstitutional discrimination against interstate commerce "where the asserted benefits of the [state] statute are in fact illusory or relate to goals that evidence an impermissible favoritism of in-state industry over out-of-state industry." Alaska Airlines, Inc. v. City of Long Beach, 951 F.2d 977, 983 (9th Cir.1991). That is not the case here. First, it is unclear that Proposition 4 penalizes interstate commerce in the sense that the costs imposed by the proposition favor in-state producers over out-of-state producers. Second, even if those costs were thought to be discriminatory in the sense required under dormant Commerce Clause jurisprudence, those costs must be real or, at a minimum, realistically threatened. The trappers contend that Proposition 4 will impose increased costs in two ways: there will be increased flood damage because of river levees that will have been weakened by animals (primarily muskrats) that would have been trapped in the absence of Proposition 4, and there will be increased costs of livestock production due to predation by untrapped animals. The district court found, and we agree, that such costs are highly speculative. We therefore conclude that the trappers have failed to make out a claim on their second theory.
 
 2. Voting Dilution Due Process Challenge
 
 78
 The trappers allege a violation of substantive due process, based on an argument that the trappers' and the public's right to vote was diluted because the ballot material accompanying Proposition 4 was materially misleading. Specifically, the trappers object to the following language contained in a section of the ballot materials entitled "Argument in Favor of Proposition 4":
 
 
 79
 Proposition 4 WILL ALLOW the use of traps and other Wildlife management techniques:
 
 
 80
 —to protect human health and safety
 
 
 81
 —to protect property, levees and canals
 
 
 82
 —to protect endangered wildlife
 
 
 83
 —to protect crops and livestock
 
 
 84
 This statement, the trappers argue, is misleading. Proposition 4 contains two separate bans on traps. Section 3003.1(a) bans trapping with any body-gripping trap (including leghold traps) "for purposes of recreation or commerce in fur." Section 3003.1(c) bans the use of leghold traps to capture listed animals, irrespective of the trapper's purpose. Therefore, according to the trappers, while the ballot material's description of exceptions may apply to the ban on body-gripping traps under § 3003.1(a), it understates the scope of the broader ban on leghold traps under § 3003.1(c).
 
 
 85
 The parties do not dispute the legal standard, as set forth in Burton v. State of Georgia, 953 F.2d 1266 (11th Cir.1992):
 
 
 86
 For such extraordinary relief to be justified, it must be demonstrated that the state's choice of ballot language so upset the evenhandedness of the referendum that it worked a "patent and fundamental unfairness" on the voters. Such an exceptional case can arise . . . only when the ballot language is so misleading that voters cannot recognize the subject of the amendment at issue.
 
 
 87
 * * *
 
 
 88
 As long as the citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon. Therefore, substantive due process requires no more than that the voter not be deceived about what amendment is at issue.
 
 
 89
 Id. at 1269 (footnote omitted). The district court found that the trappers' claim failed as a matter of law. It concluded that the description in the ballot material was not materially misleading because the allegedly false statement was in an "avowedly partisan" portion of the materials, not in the text of the proposition or in the neutral legislative analysis of the proposition. Moreover, the district court reasoned that the statement was not completely inaccurate, and that other materials accompanying the ballot included arguments against Proposition 4. We agree with the district court's conclusion that the ballot material did not rise to the level of a substantive due process violation under Burton.
 
 C. Preemption Claims
 
 90
 Finally, the trappers allege that § 3003.1 is preempted, at least in part, by the ESA and the ADCA. The district court did not reach the question of whether the ESA or the ADCA preempts these sections. We remand to the district court to allow it to determine these preemption claims in the first instance.
 
 Conclusion
 
 91
 We AFFIRM the district court's holding that Audubon's claims are justiciable and that § 3003.1(c) is preempted by the ESA and the NWRSIA. We do not reach the question whether § 3003.1(c) is preempted by the MBTA. We REVERSE the district court's holding that the trappers lacked standing, AFFIRM its dismissal of the trappers' Commerce Clause and voting dilution claims, and REMAND for determination of the trappers' ESA and ADCA preemption claims.
 
 
 92
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 93
 Each party to bear its own costs.
 
 
 
 Notes:
 
 
 *
 ANN M. VENEMAN is substituted for her predecessor DAN GLICKMAN. Fed.R.App.P. 43(c)(2)
 
 
 **
 GALE A. NORTON is substituted for her predecessor BRUCE BABBITT. Fed. R.App. P. 43(c)(2)
 
 
 [1]
 The federal parties present essentially the same viewpoint as the Audubon plaintiffs, so their arguments are not distinguished from those of the plaintiffs (except where noted)
 
 
 [2]
 The sponsors present essentially the same viewpoint as the state defendants, so their arguments are not distinguished from those of the state (except where noted)
 
 
 [3]
 Section 3003.1, at issue in this case, provides: Notwithstanding Sections 1001, 1002, 4002, 4004, 4007, 4008, 4009.5, 4030, 4034, 4042, 4152, 4180, or 4181:
 (a) It is unlawful for any person to trap for the purposes of recreation or commerce in fur any fur-bearing mammal or nongame mammal with any body-gripping trap. A body-gripping trap is one that grips the mammal's body or body part, including, but not limited to, steel-jawed leghold traps, padded-jaw leghold traps, conibear traps, and snares. Cage and box traps, nets, suitcase-type live beaver traps, and common rat and mouse traps shall not be considered body-gripping traps.
 (b) It is unlawful for any person to buy, sell, barter, or otherwise exchange for profit, or to offer to buy, sell, barter, or otherwise exchange for profit, the raw fur, as defined by Section 4005, of any fur-bearing mammal or nongame mammal that was trapped in this state, with a body-gripping trap as described in subdivision (a).
 (c) It is unlawful for any person, including an employee of the federal, state, county, or municipal government, to use or authorize the use of any steel-jawed leghold trap, padded or otherwise, to capture any game mammal, fur-bearing mammal, nongame mammal, protected mammal, or any dog or cat.
 The prohibition in this subdivision does not apply to federal, state, county, or municipal government employees or their duly authorized agents in the extraordinary case where the otherwise prohibited padded-jaw leghold trap is the only method available to protect human health or safety.
 (d) For purposes of this section, fur-bearing mammals, game mammals, nongame mammals, and protected mammals are those mammals so defined by statute on January 1, 1997.
 
 
 [4]
 The district court took judicial notice of state court records indicating that on March 23, 2000, Daniel Genaro was convicted in Shasta County Superior Court of misdemeanor violations of California Fish and Game Code § 3003.1. Genaro apparently trapped five beavers with a snare trap near an apartment complex in Redding, California, at the request of the building manager. Genaro appears not to have raised the constitutionality of the law as a defense, beyond his statement that trapping is "part of his life-style and his religion."People v. Genaro, No. 99M1766 (Cal.Super.Ct. March 23, 2000).
 
 
 [5]
 The Tenth Circuit has recently distinguished between prospective and retrospective declaratory judgment actions:
 While a declaratory judgment is generally prospective relief, in some situations it has been recognized as retrospective. F.E.R. v. Valdez, 58 F.3d 1530, 1533 (10th Cir.1995). In F.E.R., this Court found that the plaintiffs' claim for an injunction was mooted by a return of property, but their claim for declaratory relief was not moot because it was "similar to their claim for damages" and required the court "to determine whether a past constitutional violation occurred." Id. Thus, we consider declaratory relief retrospective to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred. In such a situation, however, declaratory relief is "superfluous in light of the damages claim." Green v. Branson, 108 F.3d 1296, 1300 (10th Cir.1997).
 People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1202 n. 2 (10th Cir.2002).
 
 
 [6]
 The federal parties suggest an alternative basis—sovereign immunity — for limiting § 3003.1's reach against federal government trapping authorized by the ESA. We need not reach this basis, however, because we conclude that the ESA preempts § 3003.1(c)
 
 
 [7]
 Neither the state parties nor the sponsors challenge on appeal the district court's NWRSIA preemption holding. The sponsors limit their argument to the lateness of the amendment,see supra, and the state parties do not discuss NWRSIA preemption at all. Thus, although we affirm the district court's NWRSIA preemption holding, we could, in the alternative, simply hold the argument waived. See Dilley v. Gunn, 64 F.3d 1365, 1367 (9th Cir.1995).
 
 
 [8]
 The nature of the economic injury alleged by the plaintiffs inSan Diego Guns was higher prices for guns prohibited under the challenged statute. We found that the challenged "Act [was] neither the only relevant piece of legislation nor the sole factor affecting the price[s].... Thus, any finding that the Crime Control Act had a significant impact on the increase in prices of weapons would be tantamount to sheer speculation." San Diego Guns, 98 F.3d at 1130.